## TOWN OF NORTHFIELD v. TOWN OF PLYMOUTH.

A woman was removed as a pauper, the plaintiffs claiming, that she acquired a settlement in the defendant town by marriage with one James Priest, Jr., in 1795;—and for the purpose of proving this issue, they gave in evidence a certified copy from the records of the defendant town, remaining in an early volume of the records, which was in these words,—" James Priest, Jr., married, October 1, 1795, by James Smith, justice,"—and which was not signed by the person who was then town clerk, but the plaintiffs produced evidence tending to prove, that it was written upon the book of records in his hand writing; and it was held, that this record was sufficiently made and authenticated, so far as it went, and that it proved the marriage of Priest with some one.

And it was held, that this record evidence, connected with testimony tending to prove, that as early as March, 1796, the pauper was living with Priest, as his wife, that each recognized the other as husband and wife, that every one who knew them so considered them, that they continued so to live together until 1807, when the pauper, being prosecuted for adultery, absconded, and never again lived with Priest, that no other woman ever lived with Priest, as his wife, and that he never recognised any other person as his wife, was competent and sufficient evidence, to warrant the jury in finding that the pauper was in fact married to Priest, notwithstanding it appeared, that the pauper returned to the state within a few years after she absconded, and was married to another man, and cohabited with him, as his wife, and was recognized as such by him, for more than twenty five years, and until his death, which was nearly seven years after the death of Priest, and that all this was known to Priest, while he lived, and was not objected to by him.

And it was also held, that inasmuch as the cohabitation of the pauper with the person, with whom she lived after having abandoned Priest, was known to have been illicit in its origin, and to have continued to be so until the death of Priest, any presumption of a marriage between the pauper and such person, after the death of Priest, would be highly improbable, and that, at all events, the question, whether such subsequent marriage did take place, or not, was a question of fact, in the absence of direct evidence, for the jury to decide.

A marriage *per verba de praesenti*, although followed by cohabitation, cannot be regarded as valid in this state, without virtually repealing the statute upon the subject.

Although a deposition offered in evidence may contain some irrelevant and improper matter, and a general objection is made to its admission by the party

Northfield *v.* Plymouth.

against whom it is offered, it is still not error for the court to allow the whole deposition to be read to the jury, but particularly instructing them, in the charge, to regard only those parts of the deposition which tend to prove a particular point, which it is material for the party to prove.

APPEAL from an order of removal of a pauper, described as "Betty Priest, *alias* Betty Shed." Pleas, that the pauper's last legal settlement was not in Plymouth, and that she was not chargeable to Northfield at the time the order of removal was made, and trial by jury, November Term, 1847,—REDFIELD, J., presiding.

It was admitted, upon the trial, that the last legal settlement of James Priest, formerly James Priest, junior, was in Plymouth; and the plaintiffs, to show, that, while he lived, the pauper was his wife, offered in evidence a certified copy from the second volume of the records of Plymouth, which was in these words,—"James Priest, Jr., married, October 1, 1795, by James Smith, Justice." To this evidence the defendants objected; but the objection was overruled by the court. The plaintiff also offered in evidence the deposition of Thomas Moore, the present town clerk of Plymouth, who testified, that Moses Priest was town clerk of Plymouth from March, 1790, to March, 1807, and from March, 1808, to March, 1823, and that the record above recited was remaining upon the records of the town, and appeared to be in the hand writing of Moses Priest, and that he, the witness, had no doubt, that it was in the same hand writing with the other records, which are attested by Moses Priest. To this deposition the defendants objected, upon the ground that the evidence contained therein was not proper to be given in the case; but it was admitted by the court.

The plaintiffs then gave evidence tending to prove, that as early as the witnesses recollected knowing the said James Priest, which, in one instance, was in March, 1796, the pauper was living with him, as his wife,—that each recognized the other as husband and wife, and every one, who knew them, so considered them,—that they continued so to live together until the year 1807, when the pauper was prosecuted for adultery, and ordered to find sureties for her appearance before the supreme court, and James Priest became her bail,—that at the court of inquiry the fact of her being the wife of James Priest was conceded by all, and no question made upon the point,—that no other woman ever lived with James Priest, as

his wife,—and that he never recognized any other woman as his wife.

In the course of the trial the plaintiffs offered the deposition of Polly Sprague,—who testified, among other things, that she supposed the pauper, when she lived with Priest as his wife, was called Mrs. Priest; to which portion of the deposition the defendants objected; but the court admitted it to be read to the jury, but saying to the jury, that if the witness intended merely to express her inference from the facts before detailed, such inference was not evidence, and that such seemed to the court to be the fair construction of that portion of the deposition. The plaintiffs also offered the deposition of Samuel Daman, the justice who held the court of inquiry above mentioned, who testified, that said examination proceeded, as though the pauper were the wife of James Priest, that no question was raised on that point during the examination, that testimony was introduced to prove the commission of the crime, that the pauper, upon full hearing, was bound up to the supreme court for trial, that James Priest became her bail, that the case was entered in court, and continued, and then, the pauper not appearing, the recognizance was forfeited, that the witness appeared in court for James Priest, to procure his recognizance chancered, and James Priest himself appeared, and said, " they say my wife is dead," that the court thereupon discharged the recognizance, and that the files and records of the witness, in reference to the matter, are lost. The defendants objected to the whole of this deposition, except the part in reference to what was said by Priest before the supreme court; but the court permitted the whole to be read to the jury, giving them particular instructions, that it was not to be regarded as evidence, except in those parts, where it tended to show, that Priest recognized the woman as his wife, and she recognized him as her husband.

The defendants gave evidence tending to prove, that the pauper did not sustain a good character for chastity during some portion, if not all, of the time she lived with Priest; that on one occasion she was discovered in the act of sexual intercourse with one Hathaway, who was at the time a married man; that the family friends of Priest called the pauper " Aunt Betty," and sometimes " Betty Foster,"— which was her maiden name,—while she lived with Priest; that

after the prosecution for adultery she left Priest, and was gone a year or two, and then returned and offered to live with him, but he declined to receive her; and that she then, or soon after, went to live with one Solomon Shed. The defendants also gave in evidence a certified copy from the records of David Campbell, a justice of the peace in Windham county, which was in these words,—"July 24, A. D. 1814. Solomon Shed and Betsey Priest, both of Springfield, came before me and stated, that they were determined to live together as husband and wife;" which record was signed by the justice. The defendants also gave evidence tending to prove, that the pauper and Shed, from the time they commenced living together, recognized each other as husband and wife, and were so recognized by others, except that some of the witnesses said they had understood, that they had never been married in the usual mode, but "took each other." The evidence also tended to prove, that for the last twenty five years, or more, Shed had resided in Northfield, and that he had his legal settlement there, when he died, which was in January, 1844; that the pauper lived with him, as his wife, until his death, and sustained a good reputation; and that Priest knew, that she was so living with Shed, and did not object to it. There was no evidence in the case, to show that the pauper resided with Shed, before the ceremony of marriage was had between them, which is above referred to. The defendants also gave in evidence two deeds, executed at Northfield in 1832, to which Shed and the pauper were parties on one side, and in which they were described as husband and wife.

The evidence tended to prove, that the pauper became chargeable to Northfield as early as January, 1844. And it appeared, that James Priest died in March, 1837.

The defendants requested the court to charge the jury,—1, That, if they believed the testimony in relation to the cohabitation of the pauper with Shed, the burden of proof was on the plaintiffs, to prove a prior marriage with Priest;—2, That the pauper's desertion of Priest and subsequent marriage to and cohabitation with Shed, as his wife, for the length of time proved, and until the death of Shed, and this with the acquiescence of Priest, conclusively rebut, both in law and fact, all *presumptive* evidence of her marriage to Priest; —3, That there is a presumption in law in favor of innocence; and

74

that this presumption cannot be overcome by a mere presumption of fact;—4, That the law presumes the pauper's innocence of the crimes of bigamy and adultery, during her cohabitation with Shed; and that this presumption could only be overcome by direct proof of a marriage in fact to Priest;—5, That the pauper's cohabitation with Shed for the space of time proved, subsequent to the death of Priest, with the recognition of each other as husband and wife, is evidence, that the pauper was married to Shed subsequent to the death of Priest;—6, Generally, that the court instruct the jury in reference to all the above named points;—7, That there was no sufficient evidence to connect the record of marriage, offered by the plaintiff, with the pauper.

But the court charged the jury, that they considered the evidence in regard to the marriage of Shed and the pauper sufficient to constitute a legal marriage, if there were no impediment; that the law will presume in favor of the innocence of parties cohabiting together as husband and wife, until the contrary is proved; that in the absence of all direct evidence of a prior marriage, the jury ought to consider the second marriage valid; but that this presumption might be overcome by such testimony, as the plaintiffs had given in the case, if it satisfied the jury, that the pauper was the woman married to Priest and intended to have been named in the certificate of the justice referred to; that if the jury were not satisfied of that fact, they ought to presume against the marriage with Priest; that if they were satisfied of the marriage with Priest, they might, indeed, presume a marriage with Shed, subsequent to the death of Priest,—but that this, to the court, seemed rather a forced and unnatural presumption, under the circumstances, but that the jury would judge respecting it; that if they believed any such thing took place, they would render a verdict for the defendants,—and so, also, if they were not satisfied of the marriage with Priest; but that, if these points were made out in favor of the plaintiffs, and they were satisfied, that the pauper became chargeable to Northfield in less than seven years after the death of Priest, and continued chargeable, until the order of removal was made, (which the testimony tended to prove,) they would render a verdict for the plaintiffs, upon both issues.

The jury returned a verdict for the plaintiffs. Exceptions by defendants.

*P. T. Washburn* and *C. Reed* for defendants.

I. The paper, purporting to be a certificate of the marriage of James Priest, Jr., was improperly admitted. 1. The plaintiffs claim, that this is a record. If so, it is fatally defective upon its face, in not stating *to whom* Priest was married. 2. It is also fatally defective, in not being signed by the town clerk, at the time it was made. And this is not brought within the case of *Booge* v. *Parsons et al.*, 2 Vt. 456; for there is no sufficient evidence, that this was in the hand writing of Moses Priest, or that Moses Priest was then town clerk. 3. If it be not a record, it is a mere memorandum, in the hand writing of a third person, and, as such, not admissible. 4. But if it be a record, the court erred, in permitting the jury to refer to the parol testimony in the case, for the purpose of supplying therefrom the omission of the *name* of the person, to whom James Priest, Jr., was married.

II. The deposition of Thomas Moore was improperly admitted; —1, Because it is an attempt to prove a defective record, or a mere memorandum;—2, Because it is an attempt to prove, by parol, that Moses Priest was town clerk at the periods named,—which can only be proved by a transcript from the records of the doings of the town;—3, Because it is an attempt to prove, by comparison of writings, that the defective record in question was made by Moses Priest,—which is a form of testimony only allowable in case of *experts.*

III. That portion of the deposition of Polly Sprague, which was objected to by the defendants, was incorrectly admitted.

IV. There was error in permitting all of the deposition of Daman to be read to the jury. 1. It is an attempt to prove an admission of a fact from the mere silence of the party. 2. It refers wholly to matters *inter alios acta.* 3. The fact, that the pauper was then bound up for *adultery*, is wholly irrelevant. 4. The instructions to the jury assumed, that the deposition contained irrelevant and immaterial matter; but the jury were left to select those portions. They should have been specifically designated by the court. 5. It was not competent for the court to permit irrelevant testimony to be read to the jury, and then attempt, in the charge, to exclude it from their consideration. *Irvine* v. *Cook*, 15 Johns. 239. *Haswell* v. *Bussing*, 10 Johns. 128.

V. The charge should have been in accordance with the defendants' second request. 2 Greenl. Ev. 380. *Van Buskirk* v. *Claw,* 18 Johns. 347.

VI. The defendants were entitled to a charge in accordance with their third and fourth requests. *Greensboro'* v. *Underhill,* 12 Vt. 604. *King* v. *Twyning,* 2 B. & Ald. 386.

VII. The court should have instructed the jury to *presume,* in accordance with the defendants' fifth request, that Shed and the pauper were married subsequent to the death of Priest. 2 Phil. Ev. (4 Cow. & H.) 286. *Fenton* v. *Read,* 4 Johns. 52. *Van Buskirk* v. *Claw,* 18 Johns. 347. The very fact, that they lived together as they did, after the death of Priest, cohabiting, calling each other husband and wife, and discharging all the duties incident to that relation, constituted a marriage *per verba de præsenti,* so as to bind Shed, and consequently the town where Shed had his legal settlement, to support the pauper. *Newbury* v. *Brunswick,* 2 Vt. 151.

*J. L. Buck* for plaintiffs.

1. The record was properly admitted. It is shown to be in the hand writing of the town clerk; and its not being signed by him is no objection. 2 Vt. 456. It is legal evidence of the marriage of James Priest. St. of 1787, Ed. 1791, p. 182. *Barry* v. *Bebbington,* 4 T. R. 514.

2. The depositions of Polly Sprague and Samuel Daman were competent evidence, and properly admitted. That a witness uses the term " suppose " for some other term, to express her recollection of a fact, or event, does not operate against the deposition. Under the charge this could not mislead the jury. The deposition of Daman, so far as it was admitted by the court, was proper evidence, and tended to prove the marriage of the pauper with Priest.

3. The presumption of a marriage after Priest's death is fully rebutted by the circumstances of the case.

The opinion of the court was delivered by

REDFIELD, J. The only question in this case, which is attended with any difficulty, as it seems to us, is, whether the copy from the records of the town of Plymouth is to be justly regarded as competent evidence, to prove a marriage in fact between the pauper and

Priest. The case of the *Ex'rs of Booge* v. *Parsons*, 2 Vt. 456, fully establishes the point, that this *record* was sufficiently *made* and *authenticated, so far as it goes.* It is, then, to be regarded as an authentic record of the facts, which it contains. But there is one essential defect, the omission of the name of the woman. But it does show the essential fact of the marriage of Priest with some one, and the date of the marriage. Thus far it is to be regarded as record evidence. But it is wholly inoperative to show the marriage of the pauper, until we resort to oral evidence. And that is so, to some extent, even where the record contains the names of the parties; the *identity* must be established by proof, aside from the record. And in the present case, it is scarcely less satisfactory, than the ordinary proof of the identity of the parties.

It was, then, we think, competent to show a marriage *in fact* of the pauper with Priest. How it might be regarded, in a case where the person named in the record had cohabited with different persons, so near the date of the record as to leave no certainty in regard to the person intended to have been included in the record, it is not necessary to determine. In the present case, the date of the record being at the time the cohabitation of Priest and the pauper began, and he having never cohabited with any other woman, it is rendered certain, that, if he were married to any one, it was to her. The only doubt in the case, without the record, is, whether the parties dwelt together in wedlock, or without it. The record, showing fully the marriage of one of the parties, seems to remove all doubt upon that point, inasmuch, as one person cannot enter into the estate of matrimony alone, and it is here shown, that Priest could have had no partner, unless it were the pauper,—unless, indeed, it is supposed the concubine could intrude herself into the office of the wife, without clamor from within doors, or suspicion from without,— which is absurd.

There is, then, no ground to presume a marriage of the pauper with any other person, until after the death of Priest, which was in 1837. And any presumption of such a marriage with Shed, after that date, when the parties had lived so long together in a state of adultery, is highly improbable, as it seems to us. And it seems also to be a case, where the presumption is to be left to its natural force with the jury, as it was in this case, and in the cases cited by the

Northfield *v.* Plymouth.

defendants' counsel in argument, except where one presumption is encountered by another, which is not the case here.

No doubt in some cases very strong presumptions have been made in favor of innocence; and, as it seems to me, with very little reason, sometimes. *Greensboro'* v. *Underhill*, 12 Vt. 604, which was decided mainly upon the authority of the case of the *King* v. *Twyning*, 2 B. & Ald. 386. This latter case has not been followed by the English courts altogether without question; but that was, at most, only disregarding the artificial presumption of the continuance of life, in favor of that presumption, which always exists in favor of innocence of crime. And in a recent English case, reported in the periodicals, the whole subject of presumptions of the continuance of life being fixed to the precise term of seven years, after the person was last heard from, is doubted, and, in fact, its soundness denied. But I apprehend, that, in ordinary cases, as matter of convenience, it will be allowed to prevail, upon the old basis.

The case of *Fenton* v. *Read*, 4 Johns. 51, is very much like the present; and the argument of the court is, and the decision may appear to be, different from the one which is above declared. But that case is a motion to quash the proceedings of a justice's court, upon *certiorari*. In such cases courts exercise more or less discretion, with reference to the general merits of the controversy. It was upon that ground mainly, I apprehend, that that case was decided; for the opinion is put upon the ground, that the question of a marriage, after the death of the first husband, is one of fact, and, as there was *some* testimony upon the point, the court would not disturb the finding. For the same reason, this court could not grant a new trial, if this point were properly submitted to the jury in the county court. But it is said, in a note to this case in the second edition of Johnson's Reports,—" In *Cunningham* v. *Cun-* " *ningham*, in the House of Lords, on an appeal from the Court of " Sessions in Scotland, 2 Dow 482, Lord ELDON and Lord REDES-" DALE held, that in cases of cohabitation the presumption was in fa-" vor of its legality; *but where it was known to have been illicit in its* " *origin, that presumption could not be made.*" That is precisely the ground, upon which we think any such presumption, in a case like the present, would be forced, and ought not to be made, except upon some ground, rendering it more probable, than it seems to us to

be in the present case.   The case of *Van Buskirk* v. *Claw*, 18 Johns. 346, is much like the case of *Fenton* v. *Read*, except that here there was no proof, *in fact*, of the first marriage.   Both, then, standing upon mere presumption, that was allowed to prevail, which was most probable.

In these and other New York cases, stress is laid upon the fact, that a marriage *per verba de præsenti* is valid in that state, and also at common law, if followed by cohabitation.   This, I think, could hardly be regarded as law in this state, without virtually repealing our statute upon that subject.   It certainly has never been so regarded under the English statute of 26 Geo. 2, and 4 Geo. 4, ch. 76; and I see no reason, why it should be here, when it is clearly a dispensation with all the requisitions of the statute upon the subject. Wherever that rule, in regard to the law of marriage, prevails, as it does in Scotland, cohabitation as man and wife is marriage; since it implies, in the strongest sense, a contract *in præsenti* to be husband and wife.

The question, made in regard to permitting the entire deposition of Daman to be read to the jury, notwithstanding the general objection of the defendants, and the fact that it contained some irrelevant, and perhaps improper, evidence, is a question of practice, upon which the judge, who conducts the jury trial, must be allowed some reasonable discretion.   If there were ample time, it might always be better to determine, in advance, how much of a deposition should be read to the jury, even upon a *general* objection; and in practice, ordinarily, that will be done, where the objection is *specific*.   But very often this course will require too much delay, and always the admissibility of evidence, at the opening of the case, depends so much upon what is expected to be proved thereafter, that great latitude must be allowed, or it *may* become necessary to reconsider the earlier determinations of the court, as the trial progresses.   And if improper evidence is admitted, it may readily be set right in the charge.   The recent English practice, upon this point, is much more liberal, than that which obtained as long ago as the time of Ch. Justice WILLES.   *Smith* v. *Richardson*, Willes 23.   Now it is every day's practice, at *nisi prius*, to admit evidence, subject to future objection; and even where it subsequently turns out, in the course of the trial, that a witness is interested, who has

given evidence, or, for any other cause, any portion of the testimony is found to be incompetent, it is erased from the minutes of the judge, and the case proceeds, the same as if it had never been given. Any other course would lead to very absurd results. If any the slightest testimony were admitted, which the judge, during the trial, clearly perceived was incompetent, and which, if the trial proceeded, with that testimony in the case, would render the trial useless, and still it could not be set right, without impanelling another jury, and beginning the trial *de novo,* jury trials would become so cumbersome, that they could not be endured. See *State* v. *McAllister,* 24 Maine 139.

There is no complaint, in the present case, that the jury were not properly instructed, as to what portion of the evidence was, and what was not, competent. It may not be unsuitable, or unprofitable, to say here, that any nice questions, in regard to whether one word, more or less, from a witness, upon a given point, is competent, can never answer any good purpose. Where the general scope of the testimony of a witness is irrelevant, or incompetent to go to the jury, it is highly proper it should be stopped in the outset, or as soon as its general tendency can be fairly ascertained, either from the statement of counsel, or that of the witness. But where the main current of the evidence is competent, it most conduces to the quiet and good order of the trial, as well as to the correct understanding of the case, that the witness should be permitted to tell his story *in his own way.* These remarks are, no doubt, subject to many exceptions, and have, perhaps, no necessary bearing upon the very point before the court, except in a general way.

Judgment affirmed.

DAVIS, J., dissenting.