# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT.

---

## JANE D. MORRILL v. A. W. PALMER.

---

JANUARY TERM, 1895.

---

*Common law marriage. Fraud. Statute of limitations. Evidence, cross-examination. Exception to argument. General exception to charge.*

---

1. A marriage *per verba de presenti* is not valid in Vermont.

2. In 1860, the defendant having a wife then living, represented to the plaintiff that he was a single man and thereby induced her to marry him. The ceremony was performed in Massachusetts and was void by both the law of that state and Vermont. In 1862 the first wife of the defendant obtained a divorce, and the defendant testified that he supposed this made his marriage with plaintiff legal. Plaintiff and defendant lived together as husband and wife until 1894, and during that time reared a family and accumulated a substantial property. The suspicions of the plaintiff were once or twice aroused, but the defendant, on being applied to, assured her that he had a right to marry her and that she was his lawful wife, and she at all times so

believed down to 1894.  *Held*, that the parties were not husband and wife.

3   In such case an action lies against the defendant for his fraud in persuading the plaintiff to marry him and cohabit with him.

4.   The statute of limitations began to run from the time when the facts were known to the plaintiff, for the acts of the defendant constituted a continuing fraud which was not complete so long as the plaintiff was kept in ignorance of her real condition.

5.   *Dictum*, if the statute of limitations began to run from the celebration of the marriage, the active fraudulent concealment of that fraud by the defendant would be a good answer to a plea of the statute.

6.   *Held*, that upon the evidence in this case the plaintiff had no such knowledge of nor opportunity to know the facts as would bar her right to recovery.

7.   The parties not being husband and wife, the plaintiff was a competent witness.

8.   Testimony as to the amount of the defendant's property was rightly admitted upon the question of actual damages.

9.   The objection that evidence was remote, in point of time, should be taken in the trial court, and the presumption in this court will be against error in that respect.

10.   The defendant having testified to the value of his farm, including as a part a tenement house and a wood lot, *held*, that he might be asked, upon cross-examination, as to the value of the different parcels.

11.   *Held*, that the exceptions taken to the remarks of counsel for the plaintiff in argument should not be sustained, for, (a.) Three of them were justified by the evidence.  (b.) The fourth was merely the expression of an opinion upon the weight of evidence.  (c.)  The fifth was withdrawn. (d.)  The better practice is for the trial court to restrain counsel who is abusing the privilege of argument, or, if that cannot be effectually done, to set aside the verdict.

12.   A general exception to the entire charge, or a series of propositions contained in it, will not be sustained if any portion excepted to is sound.

Action on the case for deceit.   Plea, the statute of limitations.   No replication was filed.   Trial by jury at the Sep-

tember term, Orleans county, 1894, TYLER, J., presiding. Verdict and judgment for the plaintiff. The defendant excepts.

*Dickerman & Young* for the defendant.

The parties were husband and wife. There had been an agreement to marry, followed by uninterrupted cohabitation for thirty years. This would constitute a valid marriage at common law, and does in Vermont. *Newbury* v. *Brunswick*, 2 Vt. 151; *Londonderry* v. *Chester*, 2 N. H. 268; 2 Kent's Com., 86, 87; Reeves' Dom. Relations, 196 and note 1.

The statute of limitations is a complete bar. The cause of action was complete when the fraud was consummated by the marriage in Massachusetts, and the statute would run in six years from that date. *Smith* v. *Bishop*, 9 Vt. 110; *Troup* v. *Smith*, 20 Johns. 46; *Allen* v. *Miller*, 17 Wend. 204; *Fee* v. *Fee*, 10 Ohio 469; *Clark* v. *Marriot*, 9 Gill 331; *Imperial Gas Light Co.* v. *London Gas Light Co.*, 10 Exch. R. 39; *Cook* v. *Darby*, 4 Munford 444; *York* v. *Bright*, 4 Hump. 312.

The plaintiff had full knowledge of the facts and for that reason cannot recover. *Langdon* v. *Baxter National Bank*, 57 Vt. 1; *Farnam* v. *Brooks*, 9 Pick. 246; *Vigus* v. *O'Bannon*, (Ill.) 6 West. Rep. 219; *Churchman et al.* v. *City of Indianapolis*, 110 Ind. 259; *Beaubin* v. *Beaubin*, 64 U. S. 190.

The exceptions to the argument of the plaintiff's counsel should be sustained. *State.* v. *Hannet*, 54 Vt. 89; *State* v. *Cameron*, 40 Vt. 567; *Rea* v. *Harrington*, 58 Vt. 182; *Perkins* v. *Bailey*, 6 N. E. R. 818, (N. H.); *Bullard* v. *Boston & Maine R. R.*, 64 N. H. 27; *Coble* v. *Coble*, 79 N. C. 589; *Cleveland Paper Co.* v. *Bank*, 15 Neb. 20; *Martin* v. *State*, 63 Miss. 505; *Hilliard* v. *Beattie*, 59

N. H. 462; *Tucker* v. *Henniker*, 41 N. H. 317; *Cross* v. *Grant*, 62 N. H. 676.

*C. A. Prouty* and *Theophilus Grout* for plaintiff.

The plaintiff had a good cause of action against defendant for his fraud in inducing her to marry him and live with him as his wife. *Blossom* v. *Barrett*, 37 N. Y. 434.

A common law marriage, so called, was not valid at common law and is not in Vermont. *State* v. *Bone*, 61 Me. 171, 177; *Dunbarton* v. *Franklin*, 19 N. H. 257, 266; *Goshen* v. *Stonington*, 4 Conn. 209, 219; *Dennison* v. *Dennison*, 35 Md. 361; *Estell* v. *Rogers*, 1 Bush. 62, 64; *Grisham* v. *State*, 2 Yer. 589, 592; *State* v. *Samuel*, 2 Dev. & B. 177, 179; *Rice* v. *Rice*, 31 Texas 174; *Reg* v. *Millis*, 10 Cl. & F. 534; *Beamish* v. *Beamish*, 9 H. L. Cas. 274; *Northfield* v. *Plymouth*, 20 Vt. 582.

The statute of limitations is not a bar. The fraud of defendant was a continuing fraud, and the plaintiff's right of action was not complete until the true facts were known to her. If it were, the fraudulent concealment of the fraud by the defendant is a good answer to the statute. *Cole* v. *McGlathy*, 9 Me. 131; *Rush* v. *Parr*, 1 Watts 110; *Pennock* v. *Freeman*, 1 Watts 401; *Jones* v. *Conway*, Yeates 109; *Morgan* v. *Tenor*, 83 Pa. St. 305; *Way* v. *Cutting*, 20 N. H. 187; *Douglas* v. *Elkins*, 28 N. H. 26; *District Township of Boomer* v. *French*, 40 Iowa 601; *Findley* v. *Stewart*, 46 Iowa, 655, 657; *Persons* v. *Jones*, 12 Ga. 371, 378; *Texas & Pacific Railway Co.* v. *Gay*, 86 Texas 571, 608; *Reynolds* v. *Hennessy*, 17 R. I. 169; *Carr* v. *Hilton*, 1 Curt. 237; *Mitchell* v. *Thompson*, 1 McLean 96; *Sherwood* v. *Sutton*, 5 Mason 143; *Daily* v. *Glover*, 88 U. S. 342.

TAFT, J. 1. The defendant married Calista Adams in 1856, and cohabited with her at Newport, Orleans county,

in this state, until 1859, at which time and place he left her.

She continued her residence at Newport, and obtained a divorce in Orleans county, in August, 1862. After the defendant left his wife in 1859, he went to Massachusetts, resided there for a time, and on the 7th day of Nov., 1860, a marriage was solemnized between him and the plaintiff at Salem, in that state. Under our statute, R. L., s. 2309, and under the laws of Massachusetts, the marriage in November, 1860, was void.

It is insisted by the defendant that the conduct of the parties after the divorce in 1862 made them legally husband and wife, upon the ground that, although the marriage was not solemnized according to the laws of the place where the contract was made, that it constituted what is called a common law marriage, that is, a consummated agreement, to marry, between a man and woman, *per verba de presenti*, followed by cohabitation, and that such common law marriage was a valid one, under the laws of this state. Such marriages have been held valid in some jurisdictions.

The question before us is, are they valid in this state. It is claimed that this court in *Newbury* v. *Brunswick*, 2 Vt. 151, adopted the doctrine, and its language lends sanction to the claim. In that case it was held that a marriage contract, *per verba de presenti*, was valid. The parties had contracted matrimony in Canada, before a justice of the peace who had no authority to solemnize marriages. The legislative assembly of that province afterwards passed an act declaring valid all such marriages which had been theretofore solemnized. The court said it was unnecessary to pass upon the question of what effect the act declaring such marriages valid had upon the case. Although they say there was no doubt but that its effect was to legalize the marriage before the justice to every intent, they held, that it was valid from the beginning, as a common law marriage.

We think it must be conceded, and that it is beyond question, that the effect of the act made the marriage a valid one, and therefore the case was correctly decided, the court giving the wrong reason. The case in another respect was overruled in *Landgrove* v. *Pawlet*, 20 Vt. 309. The question of a common law marriage is referred to in *Northfield* v. *Plymouth*, 20 Vt. 582. Although it was not necessary to the disposition of the case, we think the law is correctly stated by Redfield, J., in speaking of certain cases in which the question was involved, who said:

"In these and other New York cases, stress is laid upon the fact that a marriage, *per verba de presenti*, is valid in that state, and also at the common law, if followed by cohabitation. That, I think, could hardly be regarded as law in this state without virtually repealing our statutes upon that subject."

It will be observed that in this reference to the question, no notice is taken of the prior case of *Newbury* v. *Brunswick*, *supra*.

At the first session of the legislature in 1779 it was enacted

"That common law as it is generally practised and understood in the New England states, be and is hereby established as the common law of this state."

In June, 1782, it was further enacted

"That so much of the common law of England as is not repugnant to the constitution, or of any act of the legislature of this state, be and is hereby adopted, and shall be and continue to be the law within this state."

Although the common law of England was thus early adopted, it did not control a subject regulated by statute, if we had a statute upon the subject. The statute superseded the common law. The reason of the adoption of the common law is seen by the preamble to the act of 1782, in which it is stated that "It is impossible at once to provide particular statutes adapted to all cases wherein laws may be necessary."

The subject of marriage was early regulated by statute, and the common law in respect to it was never in force. At the first session of the general assembly, in March, 1778, a bill was pending for the regulation of marriages, and we infer one was passed. What it was, is not known, as the acts of that session are not preserved, but the records of the assembly show that a bill relating to marriage was pending.

At the session in February, 1784, the subject of marriage was again considered and regulated. The act required the publication of the intention of the parties, and that no persons whatsoever, other than certain officials or ordained ministers of the gospel, should solemnize marriages, nor presume to marry any man and woman. Although the statute did not declare that a marriage, solemnized in any other manner than the one required by the statute, was void, we think such was the effect. It is clear to us that this is the proper construction to be given the statute from the fact that marriages celebrated by the Quakers, in a mode not within the statute, were made legal, and this view is also confirmed by the fact that by statute (now R. L., s. 2310,) marriages solemnized before a person professing to be a justice of the peace or a minister of the gospel, shall be valid, provided the marriage is in other respects lawful, and consummated with the belief on the part of either person that they were lawfully joined in marriage. If a common law marriage was valid there was no necessity for such statutes.

We hold, therefore, that what the learned commentator, Kent, calls the "Loose doctrine of the common law," in relation to marriage, was never in force in this state. The law is the same in Massachusetts, the place in which the contract was made.

The defendant insists in respect to this marriage, the court should presume it valid, there being no proof that the

defendant had not been divorced from his first wife prior to his marriage with the plaintiff, and cites authorities to support such claim.

It is probable that in favor of morality, innocence and the legitimacy of children, such presumption might be made, nothing else appearing in the case, but it should not be permitted here, for, quoting from the defendant's brief, "The case shows that at that time (the time of the marriage between these parties) the defendant had a wife living."

If he had obtained a divorce from her prior to that time, she was not then his wife and he had none living. The defendant testified upon the trial, and if he had been divorced prior to his pretended marriage with the plaintiff, he did not act in good faith to the court in suppressing that fact, and no presumption of the kind claimed should be entertained in his favor. The case shows the defendant testified that when he heard of the divorce in 1862, "He supposed the divorce made his marriage with the plaintiff legal." It would be inconsistent in connection with this testimony to presume that he had obtained a divorce prior to the one in 1862. The point is evidently an after-thought of the counsel, being added in penmanship to the printed brief and is not before us, for it was not raised upon the trial below, and is only noticed here to show that we have the point in mind in considering the main question.

No question is made but that the action can well lie if the case is properly established; this would logically result from *Pollock* v. *Sullivan*, 53 Vt. 507, in which it was held that an action could be maintained by a single woman against a married man, for deceiving her into making a marriage contract.

2. The most important question in this case is that of the statute of limitations. Question is made whether the statute began to run from the commencement of the fraud and the marriage in November, 1860, or, from the time the

plaintiff discovered the fraud in April, 1894; and if the cause of action was complete at the time of marriage, what effect the concealment of the fraud had upon the rights of the plaintiff in respect to the statute of limitations. To determine from what time the statute began to run, it is necessary to consider the cause of action upon which the plaintiff seeks to recover. It is alleged that at the time of, and previous to, the marriage, the defendant represented to the plaintiff that he was a single man and might lawfully contract said marriage; that during all the years subsequent to said marriage he represented to her that at the time of said marriage he was a single man, the marriage a valid one, and the plaintiff in all respects his lawful wife. It is also alleged that the plaintiff relied upon the representations, that they were false, and that she was ignorant of their falsity until suit; that in consequence of such fraudulent representations, the plaintiff married the defendant, bore him children, rendered him much and valuable service during all the time, i. e. from November, 1860, until April, 1894, and assisted him in the accumulation of a large amount of property. It is claimed by the defendant that "This action accrued, if ever, immediately on the performance of the marriage ceremony, November 7, 1860, in Massachusetts." Is this claim correct? It is true she, at that time, had a cause of action against the defendant, but it was not the one she is now seeking to enforce, which is for defrauding her out of thirty-three years of service and having, as a result of his fraudulent acts, caused her to live for that length of time in a false conjugal position. It is error to assume that the cause of action for these wrongs accrued at the time of the marriage. The representations of the defendant were continuous. He perpetrated a most gross, wilful and deliberate fraud upon the plaintiff, not only by his statements that he made prior to his marriage, but by the act of marriage itself, and his continuing to live with the plaintiff

as her husband for a generation.   It was a continuing fraud.
He made these fraudulent and deceitful representations at
the time the contract was negotiated, at the time the mar-
riage was solemnized and consummated, and he continued,
by his conduct, to make them daily "From the rising of the
sun until the going down of the same."

The defendant maintained, at the beginning and subse-
quently, that their relations were legal, and the fact of his
living with her as her lawful husband was a constant repe-
tition of such representation, and amounted to a daily assertion
that their relations were legitimate.   In this respect the
case is similar to the Berkely Peerage case, 4 Camp. 417, in
which the legitimacy of a son was in question, and it was
said that if the father was proved to have brought up the
son as legitimate, this was sufficient evidence of his legiti-
macy until impeached, and, it is added, "Indeed it amounts
to a daily assertion that the son is legitimate."

In a note to *Imp. Gas L. Co.* v. *London Gas Co.,* 10
Exch. 39, it is said, in speaking of the time the statute
begins to run, that it is not from the time of the com-
mencement of the fraud.   "At all events, in those cases in
which the concealment of the wrong is in effect a continu-
ance of the wrong itself and the whole forms but one cause
of action."   Although the point was not involved in *Clark*
v. *Hougham,* 2 B. & C. 149, the remarks of Best, J., upon
the question whether concealment of the fraud prevented the
running of the statute, are much in point, viz. :

"I do not mean to disturb any of the cases which have
been read.   In them the fraud was complete more
than six years before the commencement of the action;
but, according to the evidence in this case, there was a con-
tinuance of the fraud within six years.   If that had been
properly stated in the replication, I think it would have
been an answer to the plea of the statute."

No single act of the defendant, like the marriage alone,
can be carved out and said to constitute the plaintiff's cause

of action; the gist of the plaintiff's claim is, that, as the result of the defendant's fraudulent representations extending over a period of thirty-three years, she has been wronged out of her services for that time, and placed in a false and degrading position for the whole period.

We think the plaintiff, being ignorant of the fraud, not barred by the statute until six years had elapsed after the fraudulent representations had ceased, which was in April, 1894, and had a right to recover whatever damages she had sustained which were the result of such fraudulent acts from the beginning until end thereof. It may be observed that the plaintiff's counsel forcibly contends that the active concealment of the fraud subsequent to the marriage, is an answer to the plea of the statute. While we think this claim is tenable, in case the cause of action accrued in November, 1860, we must bear in mind that the plaintiff insists that the representations of the defendant, with his subsequent conduct, constituted a "continuing representation which continued to deceive the plaintiff." We think in this view of the case the representations of the defendant constituted one continuous act, beginning in 1860 and ending in 1894, and that the cause of action did not accrue until the latter date. After the plaintiff had knowledge of the falsity of the representations, she was not, of course, deceived by them, and to recover it was incumbent upon her to bring her action within six years from the time she discovered their falsity. It was in this view that the case was submitted to the jury, and they were told if the case was in other respects established, the plaintiff could recover, if she did not discover the fraud until 1894. Holding that the statute did not begin to run until the discovery of the fraud in April, 1894, there is no occasion to consider the effect of the concealment of the fraud to defeat its running, nor the want of a replication to the plea.

3. The defendant insists that the plaintiff had full

knowledge of the fact that *he. had been married prior to November* 7, 1860, or at least full opportunity of knowledge. Conceding this to be true, the point is, did she know, at the time of her marriage in November, 1860, that he was then a married man?

The plaintiff was informed prior to their marriage, that the defendant had a wife and child then living at Newport, Vt.; she told him of such information, and released him from his marriage engagement to her; but he denied the fact of marriage, said he was a single person, at liberty to marry, and offered to take the plaintiff to his mother's in Newport; thus, by his boldness and audacity, disarming the suspicion of her and her father, who was called in to advise, and upon consultation with the latter, she came to the conclusion that the defendant was honest in his statements, and the marriage was solemnized soon thereafter.

The defendant further claims that the plaintiff should have been put upon inquiry when she visited the defendant's father's family in 1864, and was informed that a little girl, then there, was the defendant's child, that the defendant's mother told the plaintiff that the defendant had been married before but that he had been divorced. She was not informed as to when the divorce was granted and, we think, had a right to presume that it was prior to her marriage, for she was told by her husband that his marriage with her was legal.

To whom should the plaintiff have applied in order to ascertain the truth of these rumors if not to the defendant himself? When she did make such application, he said this story about his having been married before was all a fraud; that she was his legal wife, and that the child seen by the plaintiff was not his daughter; and that he had a legal right to marry the plaintiff as and when he did.

The defendant is not justified now in claiming that the plaintiff was not deceived in consequence of his repeated

declarations upon the occasions named, that he was a single man, had a right to marry, and that the plaintiff ought not to have been deceived by what he said upon the subject. The plaintiff had a right to rely upon the positive and repeated statements of the defendant that he was single.

We hold that the defendant's claim that the plaintiff had full knowledge of the matter, or such opportunity of knowledge as would amount to actual knowledge, is not tenable. The plaintiff was not called upon to act as having knowledge of the matter prior to the spring of 1894, when the facts were first made known to her.

4. As we hold the parties were not husband and wife, the plaintiff was a competent witness.

5. One question raised upon trial is shown by this extract from the exceptions, viz.: "Subject to defendant's exceptions plaintiff was allowed to introduce evidence as to the value of defendant's property." Nothing further appears in the record relative to this question. To justify us in sustaining the exception it must appear that this testimony was not pertinent to any question involved in the trial. We cannot say upon the record before us that the testimony was not relevant to some pending issue. The point is dismissed by the defendant's counsel with only this remark: "We insist it was error."

We have no desire to avoid this question and it may well be dismissed for the reasons stated. But we think it apparent from the declaration, which is always a part of the record, that the testimony was properly admitted upon the question of actual damages. The acts of the defendant if true, as alleged, resulted in a serious injury to the character of the plaintiff and an insult to her person, in that she lived for years in a state of adultery, reared illegitimate children, and was subject to a conviction for felony, with the further result of a loss of much and valuable service without compensation, in assisting the defendant in the accumulation of a large

amount of property. Such facts are charged in the declaration and testimony to prove them was properly admitted for two reasons.

(a.)  Its admission was within the rule, that so far as the cause of action rests upon an injury to character, or an insult to the person, compensatory damages may be increased by proof of the wealth of the defendant, upon the ground that wealth is an element in man's social rank and influence, and the greater the wealth, the higher the rank, and, therefore, the graeter the injury or insult.

(b.)  It was also admissible in support of the allegations in respect to the value of the plaintiff's services and the property acquired by the joint labors of herself and the defendant. The greater the wealth acquired, the greater the value of the services.

The testimony was properly admitted upon the question of actual damages. Whether it was legitimate upon that of exemplary damages it is unnecessary to pass upon, and we do not consider it.

It is now insisted that it was error to admit testimony tending to show the defendant's declarations of the value of his property without fixing any date; that while he might have had such property at some earlier period, they were not evidence that he had that amount at the time of the trial. This point was not made upon trial. The objection to the testimony was general, and it is too late now to raise the question of remoteness.

Whether the testimony was too remote or not, was a question that should have been called to the attention of the trial court. It does not appear that it may not have been within a few months of the time of the trial, and so not remote. We infer that it was near enough to justify its admission.

6.  The defendant testified as to the value of his farm, including a tenement house thereon, and a wood lot which forms part of the farm.

The plaintiff in cross-examination was permitted to inquire as to the cost of buildings and value of a portion of the real estate detached from the rest. This was not error; it was legitimate cross-examination. Such testimony might tend to show a portion of his premises worth more than what he testified the value of the whole of it was. It was certainly a legitimate mode of inquiry to test the value of his statements and enable the jury to determine what credit they would give to his testimony.

7. During the arguments of Mr. Grout for the plaintiff, he made these statements; referring to the plaintiff's sister, he said: "This sister, a whited sepulcher, caused this trouble," and further said, "That the defendant came across the line for the service of the writ for the divorce, and sneaked back;" "I think there is evidence enough, as the case shows, to hang a man;" "I knew that in the New York case they gave the woman $9,000;" "Another thing, he does not recognize this daughter that bears his image; and has no rights except what comes through this wronged woman, he repudiates her." The defendant objected and was allowed exceptions. It is stated in the exceptions that "There was no evidence tending to establish either of the statements of the above facts."

(a.) Was it reversible error to state that the "Sister, a whited sepulcher, caused this trouble?" How did it injure the defendant? There was evidently serious trouble between these parties, and it must have been caused by some one, by their own or by the acts or conduct of some other party, if some outside person caused it, such facts might tend to relieve the defendant to some extent, and be some excuse for his conduct, and so the remark would not harm him. This sister resided in the family for many years, remained with the defendant after the plaintiff left him, and was living with him at the time of the trial, and the testimony tended to show she loaned the defendant money, tak-

ing no evidence of the obligation. Notwithstanding the general statement in the bill that there was no evidence tending to establish the fact, we think, from the facts stated in the record, there was evidence from which it might be inferred. It would bring the jury system into great disrepute and be a reproach to our jurisprudence, if we reversed judgments for such remarks of counsel in commenting upon testimony.

(b.)   The evidence upon the subject of the divorce petition and service is referred to, and we think it fully justified Mr. Grout in making the statement he did.   It is fairly inferable from the testimony that the defendant's visits this side of the Canadian line between the spring of 1861 and 1865, while he resided in Canada, were few and far between, that he was cognizant of the divorce proceedings, paid the expense of them, and came over the line that the petition might be served upon him ; in fact, that he came and went as a person afraid and ashamed to be seen, which is one definition of the verb "to sneak."

(c.)   The next remark of Mr. Grout was a mere expression of opinion upon the weight of the evidence, and, although it was a violation of the rules of advocacy, it is a practice so common that it would be unjust to set aside a verdict for such remark.

(d.)   The reference to the New York case was ruled improper and was in effect withdrawn.   Nothing appears to cause us to think that Mr. Grout did not act in good faith in supposing it was proper to refer to the case as it, in part, had been read upon trial.

(e.)   The effect of the defendant's own testimony, as stated in the exceptions, established the illegitimacy of the plaintiff's daughter, and was in law a repudiation of her, and well might have been termed so by counsel.   We do not in the least vindicate counsel in making erroneous statements of facts, but the quicker and better way of correcting them is for the trial court to act in the matter, and if the

rule is violated in such a manner that the court cannot con-
trol it, as the presiding judge cannot always tell what a per-
son is about to say in time to check it, if improper, to set
aside the verdict, if obtained by such means; this would
cause counsel to be more circumspect in their arguments,
and undoubtedly correct the evil.

8. The remaining question arises upon the charge of the
court. The portion of the charge given, as set forth in the
exceptions, is upon the questions whether the plaintiff knew,
or was chargeable with knowledge, of the defendant's hav-
ing a wife living at the time of the marriage in November,
1860, of the statute of limitations, and the subject of dam-
ages both actual and exemplary; three important questions
which were fully stated and explained by the trial judge;
this part of the charge covers three and a half pages of the
printed exceptions; the exception taken was in the words,
"To all which defendant seasonably excepted." No error
was pointed out and no definite exception taken. We think
so general an exception should not be sustained.

One object of an exception is to call the attention of the
trial judge to the precise point as to which it is claimed he
has erred, that he may then and there consider it, and cor-
rect any error therein, if, in his judgment, he is in fault.
A general exception, in the form we are considering, en-
tirely defeats that object. *Goodwin* v. *Perkins*, 39 Vt. 598;
*Rowell* v. *Fuller*, 59 Vt. 688. If a general exception is al-
lowed, the party may have the right to have the same con-
sidered, but the correct rule in such case, seems to be that
if the entire charge of the court, or a series of propositions
contained in it, is excepted to in gross, and any portion ex-
cepted to is sound, the exception cannot be sustained.
*Beaver* v. *Taylor*, 93 U. S. 46; *Beckwith* v. *Bean*, 98 U.
S. 284; *Conn. M. L. Ins. Co.* v. *Union Trust Co.*, 112
U. S. 250; *Burton* v. *West J. F. Co.*, 114 U. S. 474.
Tested by this criterion, a majority of the court hold that

the exception to the charge must be overruled, for it must be conceded that the part of the charge reading as follows:

"That if the plaintiff knew of the facts of the former marriage, or if with ordinary diligence she might have discovered the fact of the former marriage six years or more before she brought the suit, she cannot recover,"

was correct, as well as the charge that exemplary damages might be awarded.

The questions made by the motion to order a verdict are included in those hereinbefore discussed and disposed of. No other questions are made by defendant's counsel, and the

*Judgment is affirmed.*

ROWELL, J., dissenting, with whom agrees MUNSON, J. It is held that the fraudulent marriage, although it gave the plaintiff a cause of action at once, is not the cause declared upon, but that she is seeking to recover for the defendant's "defrauding her out of thirty-three years of service, and having, as a result of his fraudulent acts, caused her to live for that length of time in a false conjugal position;" that it is error to assume that the cause of action for these wrongs accrued at the time of marriage, because the defendant's fraud was continuous; that he perpetrated a fraud upon her, not only by his statements before marriage, but by the act of marriage itself, and by his continuing to live with her as husband for a generation; that the cause of action declared upon did not accrue till the fraud ceased, which was in April, 1894, when she discovered it, and that, therefore, she having been ignorant of it, the statute did not begin to run till that time. In this view it is said to be unnecessary to consider the effect of the concealment of the fraud by the defendant and of the want of a replication to the plea of the statute.

The case discloses that never but once after their marriage was anything said between the parties about his former marriage, and that was in 1864, when he told her that he had never been married before, that she was his lawful wife, and that he wished her never to mention the subject to him again.   So from this time on, the defendant's fraud consisted, not at all of false verbal declarations, but wholly of the concealment of the fact of his former marriage, and of a continuous assertion by conduct only, of the lawfulness of his marriage with the plaintiff.

It is worthy of note that the ground taken by the court on this question was not suggested by the plaintiff in argument, and so was not discussed at all at the bar.   The plaintiff's position, as stated in her brief, was this :

"The claim of the plaintiff upon the trial below with reference to the statute of limitations was and now is, that she acquired a cause of action against the defendant in virtue of his representations that induced the marriage; that in less than six years after the accruing of that right of action the defendant perpetrated a distinct and substantive fraud for the purpose of preventing her from ascertaining her said right of action, and continued this fraud down to a period within less than six years before the commencement of her suit; and that she did not discover and ought not to have discovered the original fraud, because of the subsequent fraud of the defendant."

It would seem from the opinion that the plaintiff did suggest in argument the ground the court takes, for the opinion says that

"One must bear in mind that the plaintiff insists that the representations of the defendant, with his subsequent conduct, constituted a continuous representation which continued to deceive the plaintiff."

But this was said, not as a suggestion of that ground, but in connection with, and as a part of, the claim made and the position taken in what I have quoted from the brief, as will be seen if the brief is reported with sufficient fullness.

That it was not intended as a suggestion of that ground is clear from what is subsequently said in the brief, thus:

"Let it be clearly observed what the question is. It is not, Does the statute begin to run from the discovery of the fraud out of which the right of action grows? but, Is the subsequent concealment of the fraud an answer to the statute?"

The brief then goes on to say, that the latter question ought to be answered in the affirmative, and has been in a majority of instances; that it should be particularly observed that in so answering it most judges have assumed that the former question should be answered in the negative, as it has been by this court, that is, that want of knowledge of fraud is no answer to the statute, but that active concealment is.

Although the court says it is unnecessary to consider the effect of a want of a replication to the plea of the statute, yet it makes the question the same as it would have been had the plea been traversed, namely, whether the cause of action accrued within six years. So the question for discussion is, not whether the fraud is an answer to the statute, as Best, J., thought it would have been if replied in *Clark* v. *Hougham*, referred to in the opinion; but whether the cause of action accrued within the statutory period. Inasmuch as the defendant's fraudulent representations were continuous, the court considers them indivisible in point of time, and, therefore, that they must be taken as a whole, and hence, altogether constitute but one cause of action, which did not accrue until they ceased on discovery, which was a third of a century after they began and a short time before suit, and consequently that recovery may be had for the whole time. I cannot accede to this proposition. The marriage itself was as much a part of the defendant's continuous fraud as any of his subsequent representations. Indeed it was the first act of the drama of fraud that followed from that moment. Why then is it divisible from that as constituting a

separate cause of action, if all that followed is indivisible? But all that followed is not indivisible, in my judgment. The plaintiff was constantly being wronged out of her services, and constantly being placed in a false and degrading conjugal position, and, therefore, was constantly suffering special damage by reason thereof, for the recovery of which I think she has an equally constantly accruing right of action, of which she could have availed herself by suit at any time had she known of her wrong, and that her ignorance of it did not prevent the right from accruing any more than it prevented the damage from arising. I think the case comes within the rule applied to continuing torts generally, and especially to those of a permanent nature, like trespasses of that character, consisting of a series of acts connected together but extending over a considerable period of time, which are distinguishable from repeated trespasses not of a permanent nature. Although permanent trespasses may be laid with a continuando, as they used to be, instead of on divers days and times, as the practice now is, and declared for in one count, to avoid the necessity of bringing separate actions or of inserting separate counts for each day's trespass, yet in law they are considered as several trespasses on each day, and, therefore, the continuance must be answered as well as the first act. 1 Wms. Saund. 24, n. 1. See *Moulton* v. *Hill*, Salk. 638. This is so because the acts of which such trespasses consist are divisible in point of time. Thus, staying and continuing in a house after breaking and entering is as divisible in point of time as a trespass on land is in point of space, for it is a fresh trespass every day, and therefore the entire continuance must be justified. *Loweth* v. *Smith*, 12 M. & W. 582. So every continuance of a false imprisonment is a new imprisonment every day, and therefore a recovery therefor during its continuance is no bar to further recovery for its subsequent continuance. *Leland* v. *Marsh*, 16 Mass. 339.

These are cases of continued wrong with fresh violence, and, therefore, in their facts, more like the case at bar, for the defendant's continuous fraud may be regarded as having been committed afresh every day; but continuous wrongs without fresh violence, whether remedial in trespass or case, are precisely analogous in principle, I think. Thus, where the trustees of a turnpike road built buttresses to support it on the land of A, who thereupon sued them and their workmen in trespass for the erection, and accepted money paid into court in full for the trespass, it was held that after notice to the defendants to remove the buttresses and a refusal to do so, A might bring another action of trespass against them for keeping and continuing the buttresses on the land, and that the former recovery was no bar. *Holmes* v. *Wilson*, 10 Ad. & E. 503. See also *Hudson* v. *Nickolson*, 5 M. & W. 437; *Thompson* v. *Gibson*, 7 M. & W. 456; *Bowyer* v. *Cook*, 4 C. B. 236. So the wrongful and continuous diversion of the water of a spring is a continuing injury and affords a constantly accruing cause of action, so that the statute cuts off recovery back of the statutory period. *Colrick* v. *Swinburne*, 105 N. Y. 503. The same is true of the wrongful continuous flowing of land by means of a dam. *Baldwin* v. *Calkins*, 10 Wend. 166; *Reed* v. *State*, 108 N. Y. 407; *Wells* v. *New Haven & Northampton Co.* 151 Mass. 46; 21 Am. St. Rep. 423.

In *Wilkes* v. *Hungerford Market Co.* 2 Bing. N. C. 281, the plaintiff, a bookseller, having a shop by the side of a public thoroughfare, suffered loss in his business in consequence of the diversion of customers from the thoroughfare by the defendant's unnecessary continuance of an obstruction across it for an unreasonable time. The statute under which the defendant caused the obstruction provided that no action should be brought against any person for anything done thereunder until notice, nor after six months after the cause of action arose. The grievance began

April 2d, and ended July 2d, and the action was com-
menced December 30th.   The court held that the cause of
action began with the grievance, but that each  successive
day gave a new cause of action, and that therefore, the
the suit having been commenced within six months of two
days only before cesser of the cause of action, recovery
could be had for only those two days ; that no other con-
struction could be put upon the statute.

I would not, therefore, the question being as I have stated
it, give the cause of action declared upon the scope in point
of time that the court gives it.