In the Matter of the Estate of NELS F. SVENDSEN, Deceased. SVENDSEN, Respondent, v. SVENDSEN et al., Appellants.

(158 N. W. 410.)

(File No. 3693.    Opinion filed June 27, 1916.)

1. **Husband and Wife—Marriage—"Common Law Marriage"—Legislation, as Basis of Decision.**

   The question, whether or not the relation of husband and wife existed between two persons, is not one determinable according to what might or might not be best for the welfare of society, and most consonent with present advancement of public opinion; but the law-making power vested in the Legislature defines the policies of the time, and when they have spoken, the courts should declare and enforce the law as enacted. So held, concerning the statutory law as to marriage.

2. **Marriage, as a Natural Relation—Right of Society to Regulate and Protect—Rule of Statutory Construction—Penalty, Relation of, to Enforcement of Statute.**

   Marriage is a natural relation of all normal beings; and while the relation rests upon law "ordained by the Great Giver of the Universe," and therefore is not subject to absolute prohibition by man himself, yet it is the right of organized society to regulate as well as protect such relation; but, it being a natural relation not founded on human laws, no statute should be construed to annul or forbid it, because not entered into in accordance with prescribed forms, or under prescribed condition, unless the language thereof will not fairly admit of other construction; which rule holds true where statutes prescribe penalties upon the contracting parties who disregard or violate such prescribed forms or conditions.

3. **Husband and Wife—Marriage, Requisites to, Statutory Exceptions Concerning, Effect.**

   In construing statutes prescribing the requisites to a marriage, held, that, where a statute prescribes certain statutory forms and conditions for a marriage, and then declares that, under certain exceptional facts, a marriage will be valid even though such forms and conditions be disregarded, the necessary inference therefrom is that, without the existence of such exceptional facts, a marriage will be invalid where statutory forms and conditions are not complied with.

4. **Husband and Wife—Marriage—Common Law, Statutory Recognition of—Marriage "in Praesenti"—Statutes.**

   Upon the adoption of our territorial Civil Code in 1866, the Common Law was recognized in full force except "where the

law is declared by the Codes" (Civil Code 1866, Sec. 6); and held, that by Civil Code, Sec. 34, providing that marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is alone necessary, and Sec. 37, providing that consent to a mariage must be to one commencing instantly and not to an agreement to marry afterwards, the Code recognized the validity of common law marriage arises out of a contract to which the consent of parties

McCoy, J., and Polley, P. J., dissenting.

5. **Husband and Wife—Marriage—License, Necessity of—Statutes—Directory Statute.**

Under Civil Code, Sec. 46, providing that, previous to any marriage within this state, a license therefor must be obtained from the clerk of the circuit court of the county wherein the marriage is to be solemnized, and Sec. 37, providing that consent to a marriage must be to one commencing instantly and not to an agreement to marry afterwards, and Sec. 51, providing that if said clerk grants a license contrary to the provisions of the preceding sections he is guilty of a misdemeanor, and if a marriage is solemnized without such license, the parties so married, and all persons aiding in such marriage, are guilty of a misdemeanor, held, that the provision in Sec. 46 concerning the license is directory merely; and the effect of the provision in Sec. 51 concerning criminal liability in effect recognizes that, even though criminally liable, the parties are married, since its language speaks of them as parties "so married," not the parties attempting marriage. Held, further, under said Sections, and Sec. 46, providing that marriage must be solemnized, authenticated and recorded as provided in this article, but that non-compliance with its provisions does not invalidate any lawful marriage, that any marriage which complies with Secs. 34 and 37 is valid, regardless of failure to conform to those requirements looking to the solemnization, authentication and recording of the marriage; that license merely looks to the authentication of the marriage, and is not essential to a valid mariage in this state.

. McCoy, J., and Polley, P. J., disenting.

6. **Husband and Wife—Marriage—Common Law Marriage, Requisites—Contract per Verba de Praesenti—Cohabitation.**

At common law all that was generally held necessary to constitute marriage was a contract made per verba de praesenti, even though not followed by cohabitation; or such contract followed by consummation.

7. **Husband and Wife—Marriage—Common Law Marriage, Contract for Future Marriage, for Present Marriage—Invalidating Statutes.**

A contract of marriage made per verba de futuro was never

valid in this state after the enactment of territorial Code 1866, Sec. 37, providing that consent to a marriage must be to one commencing instantly and not to an agreement to marry afterwards; but a contract per verba de praesenti was valid until the amendment of Sec. 34, which originally provided that marriage arises out of a contract to which the consent of parties capable of making it is alone necessary, and the amendment to which section (Rev. Code, 1877) provided that consent alone will not constitute marriage, but that it must be followed by solemnization or by mutual assumption of marital rights, duties or obligations; and the law as to contracts per verba de praesenti was thereby materially changed. Held, further, that the language of said amendment to Sec. 34 did not prescribe a mere rule of evidence for proving mutual consent, but wrought a change in the substantive law; and under said section as amended, even though proof of mutual consent to a present marriage be established, yet no marriage is shown to have come into existence without proof of one or the other of the two things therein made essential, not as evidence of, but as elements of, a valid marriage—to-wit, solemnization, or the immediate mutual assumption of marital rights, duties or obligations.

8. **Husband and Wife—Marital Rights, Duties and Obligations, Assumption of, What Constitutes.**

In determining the legal meaning of the assumption of marital rights, duties and obligations, held, that there is no such assumption unless the parties live together as husband and wife, treat each other "in the usual way with married people," and so conduct themselves as to have full repute to be husband and wife; that by marital rights, duties, or obligations, is meant such rights, duties or obligations as arise from the contract of marriage, and constitute its object.

9. **Husband and Wife—Agreement for Present Marriage, Assumption of Marital Relations Following—Necessary Evidence—Statutes.**

Parties desiring to enter into the marriage relation in this state, while they may subject themselves to the penalties provided by Civ. Code, Sec. 51, providing that if the clerk of courts grants a marriage license contrary to the provisions of the preceding sections, &e, and if the marriage is solemnized without such license being procured, the parties so married, are guilty of a misdemeanor, may nevertheless enter into a valid marriage by agreement per verba de praesenti, but only where such agreement is followed by an immediate assumption of such relations as will give rise to an undivided repute that such parties are married. So held, construing, in connection with Sec. 51, Sec. 37, providing that consent to a marriage

must be to one commencing instantly and not to an agreement to marry afterwards, and Sec. 34, providing that marriage is a personal relation arising upon civil contract, to which the consent of the parties capable of making it is necessary, and that consent alone will not constitute marriage, but that it must be followed by solemnization or by mutual assumption of marital rights, duties, or obligations, and Sec. 46, providing that previous to any marriage within this state; a license for that purpose must be obtained from the clerk of the circuit court of the county wherein the marriage is to be solemnized.

McCoy, J., and Polley, P. J., dissenting.

10. **Husband and Wife—Marriage, Under Agreement per verba de Praesenti—Necessity of Immediate Consummation.**

Under Civ. Code, Sec. 37, providing that consent to a marriage must be to one commencing instantly, and not to an agreement to marry afterwards, and Sec. 34, providing, among other things, that consent alone will not constitute marriage but that it must be followed by a solemnization, or by mutual assumption of marital rights, duties, or obligations, held, that if a marriage is not consummated at the time of entering into the agreement for marriage, by that mutual assumption of marital rights, duties, and obligations, required by Sec. 34, the marriage relation never came into existence.

11. **Husband and Wife—Marriage, Under Agreement per verba de Praesenti—Consummation—Assumption of Marital Rights—Sufficiency of Evidence.**

Where appellants' evidence tended to prove that deceased, a bachelor, lived on his farm; had had various housekeepers, his sister having been one from October, 1911, until in July, 1912; and deceased stated to respondent's parents that he would take their daughter to Sioux City and there marry her; that they went to Sioux City, where they registered and roomed at a hotel as husband and wife, that somewhere on said trip they entered into a marriage agreement, but whether in words of the present or future did not clearly appear; that respondent returned to her parents' home with deceased, that she and deceased then advised the parents of their marriage and that it was by agreement and without solemnization; that respondent continued to live with her parents but deceased paid her expenses; that soon thereafter, she, at his request and expense, took sewing lessons in a neighboring town, he taking her to her home Saturdays and back to her lessons Mondays, rooming with her at her home Saturday and Sunday nights; that she entered deceased's home in July, 1912, and thereafter lived and cohabitated with him until his death in 1913; opposed to which there was evidence tending to prove that deceased and respondent did not go to or return from Sioux City to-

gether; that deceased never stayed-over night with respondent at her parents' home; that respondent and her sister were together considerably on the occasion of the Sioux City trip, but that she never mentioned to the sister the fact of her marriage; and that respondent did not enter deceased's home to remain therein until after the sister of deceased, his housekeeper, had left, **held**, that the evidence would support a finding that upon the Sioux City trip the parties mutually consented to enter the marriage relation at some time; but that, in view of said evidence, and of further evidence that deceased advised three or four people that they were married, but advised a far greater number that they were not, and there was no repute of their marriage prior to July, 1912, except a limited repute among those to whom deceased had stated he was married, it appearing that there was a much more general repute that they were not married; that respondent told a large number of persons that she was not married, she not having, prior to deceased's death, told more than one or two people other than her parents, that she was married, and neither spoke to or of the deceased as her husband; that respondent's mail came to her in her maiden name, by which name she went among her friends and acquaintances; that a few days prior to deceased's death he gave her a check drawn to her in her maiden name, which she cashed by signing such name; that there was no explanation offered why she went and lived with deceased after his sister left and not before; that about the time of her going to live with him she wrote to a friend a letter which, if written before she entered such home would indicate she had no intention of going there, and if written afterwards, would indicate that she had not entered deceased's home as his wife, and in which letter she stated "I am coming to Volin to work a little while;" that the evidence showed that in August, 1913, a child was born to respondent, which child was conceived while she lived with deceased, and he was undoubtedly its father. **Held**, further, that the relations of these parties was not such as to establish a general repute of marriage, even after July, 1912, and that the relation of husband and wife did not exist.

12. **Marriage—Evidence—Common Law Marriage—Statements of Decedent, Competency—Rule of Pedigree.**

In probate proceedings, involving appointment of an administrator, **held**, that statements of a decedent that he was not married, while having less affect than statements that he was—the one being self-serving, the other against interest—are admissible, under the rule admitting evidence of deceased persons on question of pedigree.

13.   **Husband and Wife—Marriage—Unsolemnized Marriage—Repute, Value of as Evidence of Parties' Relations—Competency.**

   Repute is of no evidentiary value to establish an unsolemnized marriage, unless it is based upon the apparent relations of the parties; it is admissible for the sole purpose of proving that the parties were so conducting themselves as to create the general belief that they were married; and such repute must be general, and not divided and single; it must be a reputation established by the open, undisguised and undoubted acts of the parties visible to outsiders, and not merely to the members of the household.

14.   **Husband and Wife—Marriage—Cohabitation, Presumption from, as to Marital Relations.**

   In determining the effect of cohabitation commencing in July, following an agreement made in the preceding October, to marry some time, **held,** that the effect of cohabitation from that time forward—which cohabitation would ordinarily be presumed matrimonial rather than meretricious—creates no presumption in favor of respondent's claim that she was the wife of deceased, and would therefore be no evidence of marriage, owing to the fact that there had been cohabitation between them as opportunity offered, during nearly a year prior thereto.

15.   **Husband and Wife—Marriage—Previous Contract for Future Marriage—Cohabitation—Illicit Cohabitation, Presumption of, Continuance of.**

   Where parties, some nine months previously, had verbally agreed to be married at some time, and the female party to the contract went to live with the male party thereto, and thereafter cohabitated with him, **held,** that to concede the marriage not to have been entered into prior to the time of such general cohabitation, would be to concede that prior cohabitation between them which had gone on elsewhere than at the home of the alleged husband, as opportunity offered, during nearly a year prior thereto, was illicit; and where cohabitation is illicit in the beginning, it is presumed to have continued illicit, and is no evidence of marriage.

   McCoy, J., and Polley, P. J., dissenting in part.

Appeal from Circuit Court, Turner County. Hon. ROBERT B. TRIPP, Judge.

Proceeding in probate, in which Alma Svendsen, plaintiff and petitioner, claiming to be the wife of Nels F. Svendsen, deceased, filed in the county court a petition for her appointment as administratrix of said estate, the defendants and appellants, Ingar M. Svendsen, Jens Peter Svendsen, S. C. Svendsen, Maria

Herrick, Rudolph Svendsen, Walter Svendsen, Lawrence Svendsen, and Annie Larson, claiming to be next of kin of decedent, filed therein a petition for the appointment of Alfred Jensen as administrator. From an adjudication in the county court that plaintiff was not the surviving wife, and granting letters of administration to Alfred Jensen, plaintiff appealed to the circuit court, resulting in findings and judgment in her favor, and that she was the wife of decedent, and as such entitled to have L. L. Fleeger appointed administrator. From such judgment, and from an order denying a new trial, defendants appeal. Reversed.

*Bogue & Bogue, Jones & Jones,* and *Robert H. Munger,* for Appellants.

*Spangler & Haney,* and *L. L. Fleeger,* for Respondent.

(1) To point one of the opinion, Appellants cited: Schumaker v. Great Northern Ry. Co., 136 N. W. 86.

(2) To point two of the opinion, Appellants cited: Conrad Seipp Brewing Co. v. Green (S. D.) 122 N. W. 662; Bell v. Quin, 2 Sand. (N. Y.) 146; Pinney v. First Nat. Bank, 68 Kan. 223, 75 Pac. 119, and notes; Jones v. Yokum, 123 N. W. 272, 20 S. D. 133; Johnson v. Berry, (S. D.) 104 N. W. 1114; Chambers v. Mittnacht, (S. D.) 122 N. W. 434.

Respondent cited: Renfrew v. Renfrew, (Kan.) 56, 534.

(4) To point four of the opinion, Appellants cited: Shumacher v. Great Northern Ry. Co. (N. D.) 136 N. W. 85; Potter v. Potter, 45 Wash. 401, 88 Pac. 625; Morrill v. Palmer, 68 Vt. 1, 33 Atl. 829, 33 L. R. A. 411; Norman v. Norman, 121 Cal. 620, 54 Pac. 132, 42 L. R. A. 343; Offield v. Davis, (Va.) 40 S. E. 910, 100 Va. 250; Smith v. North Memphis Savings Bank, 89 S. W. 392, 115 Tenn. 12; Beverlin v. Beverlin, 29 West Va. 732, 3 S. E. 36; Com. v. Munson, 127 Mass. 466; Norcross v. Norcross, (Mass.) 29 N. E. 506; Durbarton v. Franklin, 19 N. H. 257; Northfield v. Plymouth, 20 Vt. 590; Re McLaughlin's Estate, (Wash.) 30 Pac. 651. Appellants submitted that: Since the revision of our Code in 1877, our statutes, sections 34 and 35, Civ. Code, have been identically the same as sections 55 and 57 of California on the subject of marriage, until the year 1896.

Respondent cited: Civ. Code, Secs. 34, 35; Laws 1865-66, p. 7; Rev. Stat. 1877, Civ. Code, Secs. 34, 35; Deering's Cal. Civ. Code, Secs. 55, 57; Meister v. Moore, 96 U. S. 76; Blanchard v.

Lambart, 42 Iowa, 226, 22 Am. Rep. 245; State v. Worthingham, 23 Minn. 528; Renfrow v. Renfrow, 60 Kans. 277, 72 Am. St. Rep. 350; Hutchinson v. Hutchinson, 62 N. E. 1023; Eaton v. Eaton, 92 N. W. 995, 60 L. R. A. 605; Cromsey v. Sterling, 97 N. Y. S. 1082; Becker v. Becker, 140 N. W. 1082.

(5) To point five of the opinion, Appellants cited: Civ. Code, Secs. 86, 46-51, 53, 1271.

Respondent cited: Reeves v. Reeves, (Okla.) 92 Pac. 490, 2 L. R. A. (N. S.) 353; State v. Bittick, 103 Mo. 183, 23 Am. St. Rep. 869; Franklin v. Lee, (Ind.) 62 N. E. 78; Caras v. Hendrix, (Fla.) 57 So. 345; 26 Cyc. 840; Ferris v. Public Administrator, (Pa.) 3 Bradford Sur. 151; Hutchins v. Kimmel, 31 Mich. 126, 18 Am. Rep. 164; Meister v. Moore, 96 U. S. 76.

(6) To point six of the opinion, Respondent cited: In re Hulett's Estate, 69 N. W. 31.

(7) To point seven of the opinion, Appellants cited: Henry et al. v. Taylor, (S. D.) 93 N. W. 641; Commonwealth v. Stump, 53 Pa. State 132; Leseur v. Leseur, (Minn.) 142 N. W. 593; Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131.

Respondent cited: Blanchard v. Lambert, 43-288. Respondent submitted that: Civ. Code, Sec. 35, prescribes a rule of evidence as to how the "consent * * * may be manifested."

(8) To point eight of the opinion, Appellants cited: Sharon v. Sharon, 22 Pac. 26; Hinckley v. Ayers, (Cal.) 38 Pac. 735; Eldred v. Eldred, 97 Va. 606, 34 S. E. 477; In re Baldwin Estate, 123 Pac. 267; Quackenbush v. Swortfiguer, 136 Cal. 149, 68 Pac. 590; Jones' new Commentaries on Evidence, Sec. 87; Wigmore on Evidence, Sec. 1603; Boyington Case (Ia.) 137 N. W. 949; Peterson Case (N. D.) 134 N. W. 753; Widenhoft et al. v. Primm, (Wyo.) 94 Pac. 453.

(10) To point ten of the opinion, Respondent cited: Mortion v. Fenn, (3 Doug. 211); Wigmore's Case, 2 Salk. 438; S. P. Dumarsly v. Fishly, 4 Marsh. (Kan.) Rep. 372, S. P.; Clayton Case, 4 N. Y. 230.

(11) To point eleven of the opinion, Appellants cited: McHenry v. Taylor, (S. D.) 93 N. W. 641; White v. White, (Cal.) 23 Pac. 276.

Respondent cited: Reynoldson v. Reynoldson, 147 N. W. 844.

(13) To point thirteen of the opinion, Respondent cited: Haynes v. McDermott, 91 N. Y. 451; 43 Am. Rep. 677; Morris v. Davis, 5 Cl. & Fin. 163; Adger v. Ackerman, 52 C. C. A. 568, 115 Fed. 124; Coad v. Coad, (Neb.) 127 N. W. 445.

Respondent cited: Thomas v. Thomas, (Wash.) 101 Pac. 865; Coad v. Coad, (Neb.) 127 N. W. 455; In re Grandes Estate, 141 N. Y. S. 535; Dannelli v. Dannelli's Ad'm., 4 Bush. (Ky.) 51; Teter v. Teter, 101 Ind. 129.

WHITING, J.  On the 4th day of February, 1913, one Nels F. Svendsen, then a resident of Turner county, died, seised and possessed of personal and real property of considerable value. The parties to this action, who are designated as defendants and appellants, claiming to be next of kin of said deceased, filed, in the county court of Turner county, a petition for letters of administration and asked that one Alfred Jensen be appointed administrator of said estate.  Thereafter the party herein designated as plaintiff and respondent, Alma Svendsen, claiming to be the wife of said deceased, filed in said county court a petition asking that she be appointed administratrix of said estate.  A hearing upon said petitions in the county court resulted in the finding and adjudication that said plaintiff was not such surviving wife, and letters of administration were thereupon issued to said Jensen. Plaintiff appealed to the circuit court of said county, where a trial de novo was had, which resulted in findings and judgment in favor of said plaintiff; among other things it was adjudged that plaintiff was the lawful wife of said deceased, and as such entitled to have L. L. Fleeger appointed administrator of his estate.  From such judgment and an order denying a new trial, the defendants appealed.

The sole issue presented is whether or not deceased and respondent were husband and wife.  It is conceded that no marriage license ever issued authorizing their marriage, and that no marriage ceremony was ever performed.  Respondent claims that the facts proven established "a common-law marriage." Upon the trial appellants made no contention but that there could be, under the laws of this state, a legal consummation of marriage, even though there be neither license nor ceremonial solemnization.  Upon this appeal they for the first time contend

that in this state there can be no lawful marriage except there has been a license issued authorizing same.

[1] We have thus presented a question of the highest importance not only to the parties hereto, but to society. It is, however, not a question to be determined in accordance with any individual's views of what might be or might not be best for the welfare of society or most in consonance with the present advancement of public opinion—we are not in the happy position of the common-law jurist who, untrammeled by statutory enactment, was free, when declaring what the law was, to give due weight to the changes wrought by advancing civilization. Today the law-making power is vested in our legislative bodies—it is they that define the policies of the time—and when they have spoken, it is for the courts but to construe their words and then declare and enforce the law as enacted by them.

[2] It must be borne in mind that marriage is a natural relation resulting from the instincts instilled into and which are a part of all normal beings. While this relation rests upon a law "ordained by the great Lawgiver of the Universe," and therefore is one not subject to absolute prohibition by man himself (Newbury v. Brunswick, 2 Vt. 159, 19 Am. Dec. 703), yet it is the undoubted right of organized society to regulate as well as to protect such relation; but, because it is a natural relation in no manner founded on human laws, no statute should be construed to annul or forbid it, because not entered into in accordance with certain prescribed forms or under certain prescribed conditions, unless the language thereof will not fairly admit of other construction. This rule holds true where the statutes prescribe penalties upon those—even the contracting parties—who disregard or violate such prescribed forms or conditions. Dyer v. Brannock, 66 Mo. 391, 27 Am. Rep. 359, and numerous authorities therein cited; notes Ann. Cas. 1912D, 598; Renfrow v. Renfrow, 60 Kan. 277, 56 Pac. 534, 72 Am. St. Rep. 650; 1 Bishop Mar. & Div. (5th Ed.) § 283; Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826; State v. Zichfeld, 23 Nev. 304, 46 Pac. 802, 34 L. R. A. 784, 62 Am. St. Rep. 800; Port v. Port, 70 Ill. 484; State v. Walker, 36 Kan. 297, 13 Pac. 279, 59 Am. Rep. 556. In Meister v. Moore, supra, which is recognized as the leading case on this proposition, it was said:

"No doubt a statute may take away a common-law right; but there is always a presumption that the Legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered · into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity."

There are some decisions that seem to lay down a different rule, yet a careful analysis of them will invariably disclose that such difference is more apparent than real. Among such cases we would note the following: Furth v. Furth, 97 Ark. 272, 133 S. W. 1037, Ann. Cas. 1912D, 595; In re McLaughlin's Estate, 4 Wash. 570, 30 Pac. 651, 16 L. R. A. 699; Offield v. Davis, 100 Va. 258, 40 S. E. 910; Norman v. Norman, 121 Cal. 620, 54 Pac. 143, 42 L. R. A. 343, 66 Am. St. Rep. 74; Beverlin v. Beverlin, 29 W. Va. 732, 3 S. E. 36; Morrill v. Palmer, 68 Vt. 1, 33 Atl. 829, 33 L. R. A. 411. In Furth v. Furth and Morrill v. Palmer, supra, the decisions turned upon the proposition that in those states the marriage law was established prior to the enactment of the statute adopting the common law of England. The court in Furth v. Furth said:

"It will be seen that, before the common law was adopted here, statutes had been enacted which regulated marriages, and which prescribed the manner and form in which they might be solemnized. Such statutes having directed that marriages should be solemnized in a particular manner before certain authorized persons, that way is exclusive; and we hold our statutes regulating and prescribing the manner and form in which marriages may be solemnized are mandatory and not directory merely. In short,

we hold that the doctrine of so-called common-law marriages has never obtained or become a part of the laws of this state."

[3] The construction put upon the statutes in Beverlin v. Beverlin, supra, decided in 1887, is put upon the sole ground of the existence of certain declared exceptions in those sections of the statutes which prescribe the requisites to a marriage in that state. In cases covered by the exceptions, the statute provides that the marriage should be valid, and the court said that, by necessary implication, it must be held that the Legislature intended, in cases not within the exceptions, that the marriage should be invalid. The court, after recognizing that the general rule is as we have announced above, said:

"The statute, under consideration, in express words declares, that 'every marriage in this state shall be under a license, and be solemnized in the manner herein provided.' It is possible that these words, standing alone, should, under the general rule just stated, be interpreted as merely directory. But the statute does not stop here. It qualifies these words by provisions which would be wholly useless and unnecessary, if it were intended and should be held that the preceding provisions are simply directory. It is declared that certain marriages shall not 'be deemed or adjudged void,' because the person solemnizing them did not in fact have authority to do so. It also declares that certain other marriages shall not 'be void,' because they were solemnized without a license. These exceptions or qualifying provisions seem to me to be equivalent to an express declaration that marriages had in this state, contrary to the commands of the statute and not saved by the exceptions, shall be treated as void. It is apparent that the Legislature must have interpreted the statute as making the excepted marriages null and void without the excepting clauses, for otherwise the exceptions would be useless and would not have been made."

This seems to be the original and the leading one of several cases wherein, under statutes similar to that therein referred to, the courts have held that, by prescribing certain statutory forms and conditions for a marriage and then declaring that, under certain exceptional facts, a marriage will be valid even though such forms and condition be disregarded, it follows, by necessary implication, that, without the existence of such exceptional facts, a

marriage will be invalid where the statutory forms and conditions are not complied with. Thus in Re Estate of McLaughlin, supra; while we find a strong presentation of those reasons which might properly be presented to the legislative department to induce it to pass legislation abolishing common-law marriage, yet, when we come to look for the real basis of the decision of the court, we find the Beverlin case cited as authority and the court saying:

"Certain persons are authorized to perform the ceremony, and it is also provided that if it be performed before an unauthorized person the validity thereof shall not be questioned if such marriage be consummated with a belief of the persons so married, or either of them, that they have been lawfully joined in marriage. It is also provided that, 'all marriages to which there are no legal impediments, solemnized before or in any religious organization or congregation, according to the established ritual or form commonly practiced therein, are valid.' It is clear that in making provision for these excepted cases the Legislature was of the opinion that all attempts to establish the relationship other that in accordance with the ways provided by the statute would be void, and would be so held."

In Offield v. Davis, supra, the court recognized that, under the decisions of the majority of the states, the rule is as hereinbefore announced, but said that in none of such states are the statutes like that of Virginia. Their statute is in the exact language of that of West Virginia, and the court quotes what we have quoted from the decision in the Beverlin case and bases its decision upon the same ground. In Norman v. Norman, supra, a section with like exceptions was construed and the court suggests the same rule of construction followed in the Beverlin case. But in the Norman case we find other provisons of the statute that required the conclusion reached by the court therein. Thus we find that, previous to 1895, California had a section exactly like our present section 34, infra, and that previous to the decision in the Norman case such section had been amended by striking therefrom the words "or by a mutual assumption of marital rights, duties, or obligations," and adding in place thereof, "authorized by this Code." The court held, and we think rightfully, that this denoted a clear intent on the part of the Legislature to provide that without solemnization there could be no valid

marriage. The state of New York, in the year 1901, ingrafted upon its marriage laws some provisions similar to the section of the West Virginia statute construed in the Beverlin case. In 1907 these provisions were repealed. In the case of In re Hinman, 147 App. Div. 452, 131 N. Y. Supp. 861, will be found a review of the history of the laws of that state on the subject of marriage, and the decisions of the court construing the various statutes. It will be seen that, when the law was similar to that of West Virginia, the court placed a similar construction upon it; but that, both before and after such law was in force, the court held to the rule announced in Meister v. Moore, supra.

[4, 5] By referring to the history of the marriage laws of this state it will be found that, upon the adoption of our Civil Code in 1866, the common law was recognized in full force except "where the law is declared by the Codes (section 6, C. C.); and that by sections 34 and 37, C. C., the Code gave full recognition to the validity of a common-law marriage "in praesenti." Said sections read:

"Sec. 34. Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is alone necessary."

"Sec. 37. The consent to a marriage must be to one commencing instantly, and not to an agreement to marry afterwards."

Therefore the grounds for the decisions in Furth v. Furth and Morrill v. Palmer do not exist in this state. The statutes in force at the time of the alleged marriage, so far as the same pertain to the entering into and authentication of the marriage contract, were sections 34-60, C. C. Sections 34, 46, and 51 read:

"Sec. 34. Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations."

"Sec. 46. Previous to any marriage within this state, a license for that purpose must be obtained from the clerk of the circuit court of the county wherein the marriage is to be solemnized, agreeable to the provisions of this chapter."

"Sec. 51. If the clerk of the circuit court grants a license contrary to the provisions of the preceding sections, he is guilty

of a misdemeanor, and if a marriage is solemnized without such license being procured, the parties so married, and all persons aiding in such marriage, are likewise guilty of a misdemeanor."

Section 37 remains as it was in the Code of 1866. There is no provision similar to that which controlled the decision in the Beverlin case—in fact, in line with the express declaration found in the above quotation from the Beverlin case, our statute, requiring a license, should be held to be directory merely. Furthermore, section 51, supra, specifically recognizes that, even though criminally liable, the parties are married. The statute (section 51) speaks of them as the parties "so married," not the parties attempting marriage. Also section 45, C. C., provides:

"Marriage must be solemnized, authenticated and recorded as provided in this article; but non-compliance with its provisions does not invalidate any lawful marriage. * * *"

What other interpretation can be put upon this section than that any marriage which complies with sections 34 and 37 will be valid regardless of failure to conform to those requirements looking to the solemnization, authentication, and recording of the marriage? License merely looks to the authentication of the marriage. We conclude that license is not an essential to a valid marriage in this state.

[6-9] Do the facts proven in this case establish a marriage under said sections 34 and 37? At common law all that was generally held necessary to constitute marriage was a contract made per verba de præsenti, even though not followed by cohabitation, or a contract made per verba de futuro followed by consummation. Hiler v. People, 156 Ill. 511, 41 N. E. 181, 47 Am. St. Rep. 211; Renfrow v. Renfrow, supra; In re Hulett's Estate, 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, 61 Am. St. Rep. 419. A contract made per verba de futuro was never valid in this state after the enactment of section 37, Code 1866, but a contract per verba de præsenti was valid until the amendment of section 34. Upon the enactment of the 1877 Code, the latter half of our present section 34 was added to the old section 34, and the law as to contracts per verba de præsenti was materially changed. In amending such section we adopted the exact wording of the statute then in force in California. The addition of this new provision to section 34, that "consent alone will not constitute

marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties, or obligations"—did not prescribe a mere rule of evidence for proving the mutual consent, but wrought a change in the substantive law. Under this section as amended, even though proof of the mutual consent to a present marriage be established beyond all peradventure, no marriage is shown to have come into existence, unless there be proof of one or the other of the two things therein made essential not merely as evidence of, but as elements of, a valid marriage— solemnization, or the immediate mutual assumption of martial rights, duties, or obligations. Our present section 34 came before the courts of California for construction in numerous cases, commencing with Sharon v. Sharon, 79 Cal. 633, 22 Pac. 26, 131, and ending with Hinckley v. Ayres, 105 Cal. 357, 38 Pac. 735. Speaking of what is meant by the "assumption of marital rights, duties, and obligations," the court in the Hinckley case said:

"There is no such assumption unless the parties live together as husband and wife, treat each other 'in the usual way with married people,' and so conduct themselves as to have full repute * * * to be husband and wife."

In Kilburn v. Kilburn, 89 Cal. 46, 26 Pac. 636, 23 Am. St. Rep. 447, the court in construing what is meant by the words, "marital rights, duties, or obligations," said:

"We have no doubt that they refer to such rights, duties, or obligations as arise from the contract of marriage, and constitute its object. * * *"

With the construction of this section announced in the above quotations we fully agree. Parties desiring to enter into the marriage relation in this state, while they may subject themselves to the penalties provided by section 51, supra, may nevertheless enter into a valid marriage by an agreement per verba de præsenti, but only where such agreement is followed by an immediate assumption of such relations as will give rise to an undivided repute that such parties are married. Brisbin v. Huntington, 128 Iowa, 166, 103 N. W. 144, 5 Ann. Cas. 931; Weidenhoft v. Primm, 16 Wyo. 340, 94 Pac. 453; Topper v. Perry, 197 Mo. 531, 95 S. W. 203, 114 Am. St. Rep. 777.

[10] Respondent claims that an agreement per verba de præsenti was entered into by herself and deceased in the fore-

part of October, 1911. There is no claim of any such an agreement after that time. Therefore, under the express provisions of section 37, the marriage, if any ever existed, was entered into at that time—if not then consummated by that mutual assumption of marital rights, duties, and obligations, required by section 34, the marriage relation never came into existence. Appellants contend that there is no sufficient proof of any agreement and no proof whatever of an agreement per verba de præesenti; that, even though it were conceded that such an agreement was entered into, there was not even an apparent assumption of marital rights, duties, or obligations, prior to the latter part of July, 1912; and that, even then there was not such an assumption of marital rights, duties, or obligations as to give an undivided repute that the parties thereto were married.

[11] Deceased, a bachelor, lived on his farm. He had had various housekeepers. In October, 1911, and from then until about the middle of July, 1912, his sister was his housekeeper. Respondent was the daughter of a farmer living very near the home of deceased. The evidence submitted on behalf of respondent tended to prove the following facts: Deceased paid respondent such attention that, owing to the difference in their ages her parents raised objections. Deceased stated to the parents that he would take their daughter to Sioux City and there marry her. They went to Sioux City where they registered and roomed at a hotel as husband and wife. Upon this trip, at what time does not appear, they entered into a marriage agreement, but whether in words of the present or future does not clearly appear. Respondent returned to her parents' home with deceased and she and deceased then advised such parents of their marriage and that it was by agreement and without solemnization. Respondent continued to live with her parents, but deceased paid her expenses. Soon thereafter she, at his request and expense, took sewing lessons in a neighboring town. He took her home to her parents Saturdays and back to her lessons Mondays, rooming with her at her home Saturday and Sunday nights. The sewing lessons closed in April and respondent remained with her parents until the latter part of July, 1912, when she entered deceased's home and thereafter lived and cohabited with him until his accidental

death February 4, 1913. Opposed to such evidence there was evidence tending to prove the following facts: Deceased and respondent did not either go to nor return from Sioux City together. They did not room together at the hotel, but deceased stayed at a sister's home in Sioux City. Deceased never stayed over night with respondent at her parents' home. Respondent had a sister living in Sioux City at the time of this trip.. This sister and respondent were together considerably on the occasion of this trip; but it does not appear that respondent ever mentioned to such sister the fact of her marriage. Respondent did not enter the home of deceased to remain therein until after the sister of deceased had left.

[12, 13] We are of the opinion that the evidence would support a finding that upon this Sioux City trip these parties mutually consented to enter the marriage relation at some time. It is clear that after this Sioux City trip a rumor was circulated to the effect that they were married. Deceased so advised some three or four people; but he advised a far greater number that he was not married. While statements of deceased to the effect that he was not married should have much less weight as evidence than statements to the effect that he was—the one being self-serving and the other against interest—yet evidence of the first is admissible under the rule admitting evidence of deceased person on the question of pedigree. Topper v. Perry, supra; Shorten v. Judd, 56 Kan. 43, 42 Pac. 337, 54 Am. St. Rep. 587; Washington v. Bank, etc., 171 N. Y. 166, 63 N. E. 831, 89 Am. St. Rep. 800.

There was some repute of marriage, but nothing to show that there was any such repute prior to July, 1912, except perhaps a limited repute among those to whom deceased had stated that he was married. There appeared to be a much more general repute to the effect that these parties were not married. Repute is of no evidentiary value to establish an unsolemnized marriage, unless such repute is based upon the apparent relations of the parties. It is admissible for the sole purpose of proving that the parties were so conducting themselves as to create the general belief that they were married. To be of any evidentiary force such repute must be general and not divided and singular. It must be a reputation established by the open, undisguised, and undoubted acts of the parties which are visible to the outsiders, and not

merely to the members of the particular household. Wigmore on Evidence, § 1603; Taylor v. Taylor, 10 Colo. App. 303, 50 Pac. 1049; Quackenbush v. Swortfiguer, 136 Cal. 149, 68 Pac. 590. Prior to July, 1912, respondent at various times told a large number of apparently disinterested and reputable persons that she was not married. There is no evidence that, prior to the death of deceased, she ever told more than one or two people, other than the members of her father's household, that she was married, or ever spoke to or of the deceased as her husband. In the winter of 1911-1912 she told several people that she and deceased would be married in the spring. She denies ever making the statements to the effect that she was not married and the statements concerning marriage in the spring; but, to our minds, such statements are so overwhelmingly established by satisfactory evidence as to virtually impeach all of respondent's statements. Respondent's mail came to her in her maiden name. She went by her maiden name among her friends and acquaintances. But a very few days prior to the death of deceased, he gave her a check drawn to her in her maiden name. She cashed this check signing her maiden name thereto. The explanation she gave as to why the check was so drawn was false on its face. The reason given why respondent did not go to the home of deceased and assume her full position as his wife immediately after the alleged marriage agreement was because the house was too small and deceased was going to build a new one. It appears that respondent's parents lived in as small a home, had three other children, and that, in order to give respondent and deceased a room, had to unduly crowd the rest of their family; while, if respondent had gone to deceased's home and roomed with him, which she did nearly ten months afterwards, it would have increased the spare room at both homes. She eventually went to deceased's home and before a new house was started and lived there some six months in the old house. She did not go there to live until the sister left, and there is no explanation offered as to why she went there at that time and not before. It might fairly be presumed that she went then because he was in need of a housekeeper and she wanted a place wherein to earn a living. About the time she did go into this home— whether a day or two before or a day or two after is not clear— respondent wrote a letter to a friend, which letter, if written

before she entered such home, would clearly indicate that she then had no intention of going there, and, if written after she had entered such home, would indicate that she had not entered the same as the wife of deceased and expected to remain therein but temporarily. This letter was written July 23, 1912, and in it she stated to this friend: "I am coming to Volin to work a little while."

[14, 15] If respondent had alleged a marriage of the date when she entered deceased's home in July, 1912, her claim would be entitled to more serious consideration. But she makes no pretence of an agreement at that time. Furthermore, the fact of cohabitation from that time forward—which cohabitation would ordinarily be presumed matrimonial rather than meretricious— would creat no presumption in her favor and would therefore be no evidence of marriage, even if cohabitation alone is ever evidence of marriage, owing to the fact that there had been cohabitation between them, as opportunity offered, during nearly a year prior thereto. To concede the marriage not to have been entered into prior to July, 1912, would be to concede such prior cohabitation illicit, and, where cohabitation is illicit in the beginning, it is presumed to have continued illicit and is no evidence of marriage. Weidenhoft v. Primm, supra; In re Boyington's Estate, 157 Iowa, 467, 137 N. W. 949. Furthermore, as before noted, the relations of these parties was not such as to establish a general repute of marriage even after July, 1912.

It appears that in August, 1913, a child was born to respondent. This child was conceived while respondent lived with deceased, and he was undoubtedly its father. While it is much to be regretted that this child may have to be denied the rights that would come to it as the legitimate child of deceased, and while the whole conduct of deceased toward respondent merits severe condemnation, yet it is not for this or any other court to disregard the laws of our state, even though such court might feel that justice would be promoted thereby. By so doing we would take property, which by the laws of this state—be they just or unjust—belongs to certain persons, and give the same to those having no legal claim thereto.

The judgment and order appealed from are reversed.

McCOY, J. (dissenting in part). I concur in everything

said in the foregoing opinion, excepting upon the proposition that a license is not an essential to a valid marriage in this state. I most fully agree with the language of the opinion that the law-making power of this state is vested in our Legislature, and that when the Legislature has spoken it is for the courts to construe and give effect to, rather than annul, such legislative enactments. The courts have no power to annul or disregard the plain provisions of a legislative act by resort to any sort of judicial sophistry or legerdemain; that the only ground upon which a lawfully enacted statute may be annulled by the court is that it is in contravention of either the federal or state Constitution. It is apparent from the reading of our statute upon the subject of marriage that no form of ceremonial solemnization is essential to a valid marriage, and while noncompliance with the law as to solemnization, authentication, and recording will not invalidate a marriage otherwise lawful, still, I am of the view that there can be no otherwise lawful marriage within this state without a license. Parties desiring to enter into the marriage relation may do so without going before a clergyman or a public officer and publicly acknowledging that they enter into such contractual marriage relation; but they may enter into such relation privately by mutual agreement providing they previously obtain a marriage license. Prior to 1890 there is no doubt but that there existed in this state a sort of qualified common-law marriage such as is by this opinion said to now exist. By chapter 109, Laws 1890, there were brought into the marriage laws of this state, along with other sections, what are now sections 46 and 51, Rev. Civ. Code of 1903. Section 46 provides:

"Previous to any marriage within this state, a license for that purpose must be obtained from the clerk of the circuit court of the county wherein the marriage is to be solemnized, agreeable to the provisions of this chapter."

And section 51 provides:

"If the clerk of the circuit court grants a license contrary to the provisions of the preceding sections, he is guilty of a misdemeanor, and if a marriage is solemnized without such license being procured, the parties so married, and all [the parties] aiding in such marriage, are likewise guilty of a misdemeanor."

These sections 46 and 51 came into our marriage law as an

addition and amendment thereto and had the effect of qualifying and limiting the effect of all previously existing laws upon the subject of marriage. The express language of these sections 46 and 51 is that previous to any marriage within this state a license for that purpose must be obtained, and if a marriage is solemnized without such a license the parties so married, and all persons aiding in such marriage, are guilty of a misdemeanor. This language, under the usual and ordinary rules of statutory construction, is just about as mandatory and prohibitory as plain English language could made it. The use of the word "must" indicates and implies mandatory intent. Penalizing the parties entering into such contract implies and imports mandatory prohibition just as strongly as the use of express prohibitory words. Norbeck & Nicholson Co. v. State, 32 S. D. 189, 142 N. W. 847, Ann. Cas. 1916A, 229. The imposition of a penalty, however, does not always necessarily render the statute mandatory or the penalized act void; the test seems to depend upon the purpose of the penalization, and the purpose for which the act was passed; thus, if an act relates strictly to a revenue measure, the only purpose being to increase the revenues, the statute, although containing a penalty, is generally held not to be mandatory, although in some jurisdictions a strictly revenue measure, containing a penalty, is held mandatory. But, on the other hand, wherever the object of the statute involves a matter of public policy and is passed for the purpose of protecting the public and regulating society, the performance of the act thus penalized by statute is almost uniformly held to be absolutely void. Elliott on Contracts, §§ 666 to 670; 9 Cyc. 476. The general purpose of a marriage license law is held by all courts to be of a public nature to correct evils resulting from illicit relations, to prevent litigation in relation to spurious claims based on loose common-law marriages, and to prevent marriages of persons whose ages and whose physical and mental conditions are such that for the good of society they should not be permitted to enter into the marriage relation; and by penalizing the parties entering into the marriage without a license, under all the usual and ordinary rules of statutory construction, the Legislature of this state prohibited and made absolutely void all marriages entered into in this state without a license. The penalization of the parties has the same

force and effect as express prohibition. Every object and every benefit sought to be secured by the marriage license law may be defeated by the common-law marriage route promulgated by the opinion in this case, if such common-law marriages are construed lawful without the previous procurement of a license. I cannot concur in the provisions and purposes of said sections 46 and 51 being so disregarded and nullified. I am not unmindful of the fact that where parties may have entered into a common-law marriage without a license, that there might be circumstances that might estop one or both from denying the existence of the marriage relation between them; but there is nothing of that character in the circumstances of this case.

POLLEY, P. J., I concur in the above.