15 N.J. Super. 513 (1951)
83 A.2d 614
RITA JORDAN, CHARLES W. JORDAN, HER HUSBAND, AND VINCENT PONTANI, PLAINTIFFS-RESPONDENTS,
v.
ADELAIDE MOHAN, ALSO KNOWN AS ADELAIDE PONTANI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1951.
Decided October 11, 1951.
*515 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. Barney B. Brown argued the cause for defendant-appellant.
Mr. Albert B. Melnik argued the cause for plaintiff-respondent Vincent Pontani.
*516 Mr. Samuel P. Orlando argued the cause for plaintiffs-respondents Rita Jordan and Charles W. Jordan (Messrs. Orlando, Devine & Tomlin, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
It will be expedient and advantageous first to state concisely the acknowledge facts of basic relevancy to the paramount issue in the present case.
By a warranty deed dated April 1, 1943, a parcel of real estate situate in the Township of Berlin, Camden County, New Jersey, was conveyed to "Samuel Pontani and Adelaide Pontani of the City of Philadelphia, County of Philadelphia and State of Pennsylvania (husband and wife)." The grantee, Samuel Pontani, died intestate on November 5, 1948, a resident of the Township of Berlin, New Jersey, having retained during his life his interest and estate in the premises described in the deed. The plaintiffs Vincent Pontani and Rita Jordan, the son and daughter of the decedent, are his surviving heirs at law. They are not the issue of the grantee Adelaide Pontani.
The plaintiffs instituted the present action on June 16, 1950, in which they alleged that they are tenants in common of the premises and as heirs they are collectively entitled to an undivided one-half interest therein. They sought partition and an accounting. The defendant denied the existence of the plaintiffs' alleged interest and by way of counterclaim solicited a judgment confirming her sole ownership as the surviving tenant of an estate by the entirety.
The grantees designated in the deed as husband and wife had never been united in wedlock by any ceremonial marriage. Whether the matrimonial relationship was originated by a common-law marriage was the supremely controversial issue of the case.
It may be incidentally recalled that a common-law marriage contracted in this State on or after December 1, 1939, has no validity. R.S. 37:1-10. It was the insistence of the defendant in the present action that the compact of marriage *517 between the decedent and herself was made on June 30, 1940, in the City of Philadelphia, at which time both of them were residents of that city. Its consummation and its validity were accordingly considered to have been governed by the then existing law of the State of Pennsylvania.
Ordinarily, the validity of a marriage is determined by the lex loci contractus, and whenever the common or statute law of any state, territory or other jurisdiction of the United States is pleaded in an action in any court of this State, the court shall take judicial notice of the law of that jurisdiction and may inform itself of such laws in such manner as it may deem proper. In the absence of such pleading, it shall be presumed that the common law of such state, territory or other jurisdiction of the United States is the same as the common law as interpreted by the courts of this State. L. 1941, c. 81, amended L. 1942, c. 104 (R.S. 2:98-28 et seq.); Franzen v. Equitable Life, &c., Society, 130 N.J.L. 457 (Sup. Ct. 1943).
In the present case it is not apparent that the applicable law was either pleaded or proved. Kelly v. Kelly, 134 N.J. Eq. 316 (Prerog. 1944); Bosze v. Metropolitan Life Insurance Co., 1 N.J. 5 (1948); Shepherd v. Ward, 5 N.J. 92 (1950).
However, since the cause of action was debated before the judge of the Chancery Division and evidently considered and decided by him in the light of the decisional law of the courts of Pennsylvania, we will review it in the same aspect.
We are not aware of any more informative exposition of the law of Pennsylvania concerning this subject than that which we quote from the recent decision of the Superior Court of Pennsylvania in Ksionska v. Philadelphia & Reading Coal & Iron Co., 82 A.2d 505 (Super. Ct., July 19, 1951):
"A common law marriage, admittedly valid in Pennsylvania, is one effected by agreement of the parties without the benefit of the formality of a church ceremony, an officiating officer, and without license. Essential prerequisites are mutual consent and intention *518 to effect a present marriage, as distinguished from an agreement to effect a marriage at some future time. That mutual intention must be expressed per verba de praesenti and not per verba de futuro.
A common law marriage may be established by (1) proof of the contract itself; and (2) proof of cohabitation and reputation from which the fact of the contract may be inferred. Pierce v. Pierce, 355 Pa. 175, 179, 49 A.2d 346 [Sup. Ct. 1946]; In re Nikitka's Estate, 346 Pa. 63, 29 A.2d 521 [Sup. Ct. 1943]; In re McGrath's Estate, 319 Pa. 309, 315, 179 A. 599 [Sup. Ct. 1935]; In re Craig's Estate, 273 Pa. 530, 533, 117 A. 221, 222 [Sup. Ct. 1922]. It is the fact of the contract itself which is the proof of the marriage. Proof of cohabitation and reputation as husband and wife does not establish the marriage, but is evidence from which the fact of a marriage contract may be presumed or inferred. Grimm's Estate, 131 Pa. 199, 201, 18 A. 1061, 6 L.R.A. 717 [Sup. Ct. 1890]; In re Yardley's Estate, 75 Pa. 207 [Sup. Ct. 1874]; Pierce v. Pierce, supra, 355 Pa. 179, 49 A.2d 346 [Sup. Ct. 1946]. Such presumption or inference, however, may always be rebutted and will wholly disappear in the face of proof that no marriage in fact had been celebrated. In re Nikitka's Estate, supra; Appeal of Reading Fire Ins. & Trust Co., 113 Pa. 204, 6 A. 60 [Sup. Ct. 1886].
If a litigant does not rest a case upon proof of cohabitation and reputation but offers evidence of the marriage contract itself, the result must depend upon the sufficiency of the latter evidence. Pierce v. Pierce, supra, 355 Pa. 179, 49 A.2d 346 [Sup. Ct. 1946]; Fitzpatrick v. Miller, 129 Pa. Super. 324, 327, 196 A. 83, 85 [Super. Ct. 1937]; Murdock's Estate, 92 Pa. Super. 275, 277 [Super. Ct. 1927]. Evidence of cohabitation and reputation as man and wife are of no avail if the asserted contract does not meet the standards required by law. Pierce v. Pierce, supra; Bisbing's Estate, 266 Pa. 529, 531, 109 A. 670 [Sup. Ct. 1920]; Fitzpatrick v. Miller, supra; In re Murdock's Estate, supra.
Mr. Justice Patterson, speaking for the Court in Re Nikitka's Estate, supra, said, 346 Pa. at page 65, 29 A.2d 521, 522 [Sup. Ct. 1943]: `* * * it has been held over and over again that where the claimant herself proves that no valid contract was actually entered into, evidence as to cohabitation and reputation is worthless.' If, however, there is proof of a valid marriage contract, evidence of cohabitation and reputation is proper corroboration of that fact,  corroboration in the sense that the parties had, relying upon their agreement, lived together as husband and wife and were so known and recognized in the communities in which they lived."
Inasmuch as the central point of the present appeal implicates the weight of the credible evidence, we endeavor in a summary fashion to impart the evidence introduced by and on behalf of the defendant.
*519 During some period of time before June 30, 1940, the decedent had been a widower with the two children, then minors. The defendant was a widow with one son, her husband having died on January 7, 1939. There is no intimation that their associations were meretricious, but rather their relationship was characteristic of a conventional courtship. We ascribe some material significance to that fact. They were not of the same religious sectarian faith and that disparity intervened in their discussions of prospective marriage. Vide, Chirelstein v. Chirelstein, 12 N.J. Super. 468, 483 (App. Div. 1951). Had it not been for that impediment it may logically be inferred that the parties would have by mutual consent been united by means of a ceremonial marriage. That circumstance we regard as enlightening and explanatory of their chosen course of procedure.
About three weeks prior thereto they ultimately resolved to become husband and wife on June 30, 1940, and thereafter cohabit as such. It seems to us perfectly natural and not fantastic that in the consummation of such an agreement they would practice some deception on their children and represent to them that they intended to enter into a ceremonial marriage on that day at Williamstown. It is reasonable to infer that in the pursuit of their plan, they would not invite but rather discourage their children from accompanying them to Williamstown for a fictitious purpose.
The defendant testified that in the forenoon of June 30, 1940, in pursuance of their previous understanding and arrangements, Mr. Pontani visited her at her apartment and said: "Will you be my wife?" She replied, "Will you be my husband?" They kissed and he placed a wedding ring upon her finger and remarked, "Now we are man and wife." The defendant describes their mutual intentions in these words: "And he kissed me, and in the eyes of God we felt we were man and wife."
They had planned a honeymoon trip that day to Atlantic City, where pursuant to arrangements they met her son and his girl friend. A photograph of them taken at Atlantic *520 City on that occasion shows the defendant wearing a corsage of gardenias. Upon their return that evening to his apartment, his daughter had prepared for them a wedding cake.
The defendant produced a card which she received at that time from her sister. It is dated June 30, 1940, and deserves to be exhibited in full:
 "OUR WEDDING CONGRATULATIONS
 TO YOU BOTH
 Sister and Sam.
 May your joys all keep increasing.
 May your plans and dreams come true,
 And may the years that lie ahead
 Bring happiness to You."
 (On the back:)
 "Philadelphia
 June 30  1940
Dear Sister:
This little card I am sending you, is just to say Hello, with our good wishes for Health, wealth & Happiness to you and Sam, thinking of you always, with lots of love.
 Loving Sister
 (Signed) Mame"
The fact that the decedent and the defendant cohabited as man and wife from the date of the alleged marriage to the date of his death does not encounter the slightest contradiction in the evidence. Among the many cards from the decedent and others which the defendant has sentimentally retained are those entitled "Happy Birthday to my wife," signed "Your Husband"; "Birthday Greetings to My Wife and Sweetheart and Lots of Love," signed "Your Hubby"; similarly signed are "Happy Birthday to My Wife," "A Christmas Message to My Wife," "For My Wife, a Birthday Greeting," "To My Darling Wife," "A Christmas Wish for My Wife," "To a Very Dear Wife on Valentine's Day."
Also illuminative are cards from "Joanne," the daughter, then five years of age, of the plaintiff Rita Jordan, envelope postmarked September 26, 1947, entitled "Happy Birthday, Grandma," and others from "Vinnie," the plaintiff Vincent Pontani, entitled "To Mom on Her Birthday," "Love to *521 Mother on Easter," "For Mother with Love at Christmas," "Greetings to a Wonderful Mother," and "To a Wonderful Mother and Dad at Christmas."
It is also notable that on October 18, 1949, almost a year after the decedent's death, the plaintiff Vincent Pontani procured a policy of insurance from the Metropolitan Life Insurance Company in which he designated "Adelaide Pontani," the defendant, as the sole beneficiary and represented her relationship to him to be "stepmother."
We recognize the general principle that the mutual intention to create a common law marriage must be expressed per verba de praesenti and not per verba de futuro, but we are not persuaded that under the law of Pennsylvania the determination of the mutual intention to make such a contract must necessarily be confined to the literal meaning of the words uttered to the exclusion of the contemporaneous conduct of the parties and the accompanying and surrounding conditions and circumstances. Caddy v. Johnstown Firemen's Relief Ass'n., 129 Pa. Super. 493, 196 A. 590 (Super. Ct. 1938); In re Rosenberger's Estate, 65 A.2d 377 (Sup. Ct. Pa. 1949).
In the decision last cited Chief Justice Maxey remarked:
"A `wedding ring' has for centuries been a symbol of marriage. Counsel for the appellant stresses the fact that Grace did not formally `accept' the ring, but merely said, `That is fine, I love it.' When in any marriage ceremony the groom places the wedding ring on the finger of his bride, the bride does not usually reply, `I accept this ring as proof of our marriage.' The fact that she extends her hand to have the ring placed upon the appropriate finger and keeps the band there is sufficient evidence of her acceptance of it as the sign and symbol of her legal union with a man who thereby shows that he has chosen her as his wife."
In the present case the defendant produced a wedding ring which she testified that she had worn continuously from the day of the alleged marriage. It bears the inscription "S.P. to A.M. June 30, 1940." If the testimony concerning such a conspicuous and habitual practice as the wearing of the ring were false, the plaintiffs would reasonably have been expected to refute it. They did not attempt to do so. Moreover *522 it is incidentally observed that although the decedent died on November 5, 1948, this action was not instituted until June 16, 1950. Evidently the plaintiffs in the existing circumstances believed that their father and the defendant were husband and wife until they ultimately discovered that a ceremonial marriage had not been performed.
Certain ingredients of the defendant's testimony have not eluded our attention. Upon being recalled the defendant's recollection seems to have been reinvigorated and she added that when the decedent kissed her and placed the wedding ring on her finger he said, "Now we are man and wife," and concerning the purchase of the ring she was subjected to the following cross-examination:
"Q. Where was it bought?
A. On 52nd Street.
Q. When?
A. About two weeks before we were married.
Q. Where on 52nd Street was it you bought this?
A. Between Walnut and  I don't know, some small street.
Q. To the north or south of Walnut?
A. South.
Q. On which side of the street?
A. On the west, I guess it was. I am not sure.
Q. On the west side?
A. Yes.
Q. Can you be a little more definite?
A. Bajian, or something, his name was. I don't know what it was. A small jewelry store there. It's still there.
Q. How much did you pay for the ring?
A. I don't know.
Q. You were present, were you not?
A. I don't know what he paid for it.
Q. When was the inscription put on?
A. We left it to have it done."
Mr. Babaian testified that he was acquainted with the decedent and from memory he denied that the ring was purchased from him. It was disclosed that there are more than seven jewelry stores on the same side of 52nd Street in that neighborhood, one of which is but two doors from the Babaian store.
*523 We specifically refer to those features of the defendant's testimony because the trial judge apparently deemed them to be of sufficient improbability to justify the rejection of her testimony in all of its essential particulars.
In our review of this cause in respect to the issues of fact, we have been deeply conscious of our duty to give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 1:2-20; Rule 4:2-6. However, we are of one mind that in the existing state of the evidence in the present case the trial judge attributed too sweeping an effect to the probable exaggerations and imperfections in the defendant's testimony to which we have alluded.
In this instance we feel constrained to exercise our appellate power to make our own independent findings of fact. Lehmann v. Lehmann, 7 N.J. Super. 232 (App. Div. 1950); Series Publishers, Inc., v. Greene, 9 N.J. Super. 166 (App. Div. 1950); Donofrio v. Haag Brothers, 10 N.J. Super. 258 (App. Div. 1950); Capone v. Norton, 11 N.J. Super. 189 (App. Div. 1951), cert. granted 7 N.J. 78 (1951); In re Perrone, 5 N.J. 514 (1950).
The judgment under review is reversed with the direction to enter final judgment in favor of the defendant, with costs.