## In re ERICKSON'S ESTATE

SEGER et al., Appellants v. ERICKSON et al., Respondents

(64 N. W.2d 316)

(File No. 9409. Opinion filed May 15, 1954)

**E. G. Jones,** Sioux Falls, for Appellants.

**Danforth & Danforth,** Sioux Falls, **W. R. Cleland,** Vermillion, for Respondents.

LEEDOM, J.    This appeal involves a dispute over the estate of Selma C. Erickson who left no will.   Other issues arising from the probate of this estate were decided in Lass v. Erickson, 74 S.D. 503, 54 N.W.2d 741.   Respondent claims the entire estate on the theory that he is the deceased woman's surviving husband by a common law marriage. The other claimants are next of kin. The estate is of such size that all of it will pass to respondent if his claim to be the surviving husband is sustained.   The county court upheld respondent's position.   The next of kin appealed to the circuit court and that court likewise entered a judgment decreeing respondent to be the husband of decedent, and therefore her sole heir entitled to the whole of the estate.   This appeal is from such judgment.   We reverse the circuit court.

The deceased woman and the respondent first met as young people, both employed in the Union Club of Chicago. Both had been born in Sweden.   They became friendly and talked of marriage.   They discussed the prospects of moving to South Dakota where respondent was planning to live and

to operate a farm owned by a friend. , He did leave Chicago and moved onto the farm in Clay County in about 1892, expecting decedent to follow him. They had talked about being married in the Lutheran Church. Some months after respondent's move to South Dakota he wrote a letter to decedent and received an early reply stating that she had quit the Union Club, was going to work in a private home, had changed her mind and would not be coming to South Dakota. Respondent made no further contact with decedent and never expected to hear from her again.

About a year later however decedent arrived at the farm in a livery rig wholly unannounced. From that time on and for more than twenty-five years respondent and decedent lived together and had the reputation of being man and wife. From all appearances they conducted themselves as such. There are numerous documents bearing the parties' signatures, indicating that a marriage relationship existed between them. There is no question as to abundant proof of habit or conduct, and reputation, consistent with marriage. The case however is not limited to this type of proof. There was direct evidence offered, respondent's own testimony, in an effort to prove the marriage agreement or the words of consent to marriage that were expressed by respondent and the decedent at the time she arrived on the farm and the parties began to live together.

There was no one available to testify to these words excepting respondent. No one was present other than the parties. In a very exacting and exhaustive examination the only conversations disclosed that expressly relate to the purpose of the cohabitation, or from which it could be claimed the consent of the parties to marriage might possibly be inferred, are the words appearing in this testimony of respondent relating to the time of decedent's arrival at the farm: She said: "I've come out here to help you out". After she had alighted from the buggy with her grips and the liveryman drove away respondent said to her "Why didn't you write to me and let me know you were going to come so I could get things ready?" He also said: "people here would begin to talk". She replied "Well, they'll forget that after a while."; and also stated "That part is all right. We can tell

the people here we got married in Chicago". He then said "Well, if you want it that way * * *", and "If you're going to do that, you've got to drop your name and take the name of Erickson". She agreed to that and he said "I'll introduce you to my friends and everybody as Mrs. Erickson", and "After this you're Mrs. Erickson", to which proposal she acquiesced. Such statements we construe as parts of a plan to deceive rather than as evidence of marriage, as hereafter appears.

The record shows no other conversations between the parties from which it can be claimed there was either express or implied consent to marriage. The record on the contrary affirmatively establishes by respondent's testimony that there were no other such conversations. Later in the opinion we discuss in more detail the testimony that bears on consent to marriage, as distinguished from intention simply to live together in fornication or concubinage and to cover up this socially unacceptable status by falsely representing a marriage relationship to the public.

A sister of decedent came by prearrangement from Sweden to make her home on a farm adjoining respondent's. She brought her three children with her and lived in the Erickson home for several months. She then moved with her children to the other farm about a half mile away from the Erickson place. In the course of time gossip began to circulate in the community about the relationship between respondent and the sister. Two infants appeared in the home of the sister brought there by her, following an absence. The record is not clear as to whose children these two were. One was taken away not long after its appearance. The other was reared by the sister and respondent, as hereafter appears.

The relationship between respondent and decedent became disturbed. In addition to the gossip concerning responent's relationship with decedent's sister, there was testimony from respondent concerning decedent's infidelity. Apparently because of this unsatisfactory relationship between them, decedent without giving any warning or information as to her destination, left the farm home temporarily and remained in Chicago for a period of several months. Later she

returned and the relationship between her and respondent came to a definite end by an agreement in writing under which a substantial accumulation of property was divided between them. On the consummation of this agreement, respondent, decedent's sister and the four children all moved to a farm in Minnesota and commenced a period beginning then, about 1922, and extending down to the present time, in which all have occupied the same home. As the children grew to maturity they left the home.

This woman with whom respondent has made his home since about 1922, that is for some thirty-two or thirty-three years, is one of the next of kin, a sister as stated, of decedent. With respondent adjudged not to be the husband, this sister, under the evidence, takes a one-sixth interest of decedent's estate. The relationship between decedent on the one hand, and respondent and this sister on the other, was one of complete estrangement from the time of the separation in South Dakota to the time of decedent's death.

We bear in mind that the burden of proving a common law marriage is on the one who relies on it, in this case respondent. Agnew v. Agnew, 58 S.D. 164, 235 N.W. 644; also that courts look with disfavor on noncermonial marriages, scrutinize the evidence carefully and require that they be established by clear and convincing proof. 55 C.J.S., Marriage, § 6, p. 818. Such marriages are a source of fraud and perjury. They are to be tolerated only and not encouraged. It should plainly appear that there was an actual agreement to form a legal relationship of husband and wife and that there was a marriage in fact. In re Murdock's Estate, 92 Pa.Super. 275. The strict attitude of courts toward this type of marriage is indicated by the fact that in none of the cases in which the issue has been presented to this court (all such cases being cited in this opinion excepting Beuck v. Howe, 71 S.D. 288, 23 N.W.2d 744) has there ever been a holding that marriage existed. In the Svendsen and Bracken cases, cited hereafter, the adjudications that there were no marriages required reversals of the trial courts. This is not to say that there cannot be a valid marriage without ceremony and formality in South Dakota. The opposite is true; but such a marriage can exist only under "exceptional facts"

as stated in the Svendsen case. Public policy toward the nonceremonial marriage is indicated by restrictive statutes such as those enacted in South Dakota that impose additional requisites to the requirements of the common law with respect to marriages not solemnized; and public policy is further indicated by the large number of American states that have abolished informal marriages completely.

■ Consent is an essential element in all marriages as indicated by the ancient maxim "Not cohabitation but consent makes the marriage". Consent to a marriage not solemnized may follow three different channels of proof: (1) words of consent in the present tense; (2) words of promise relating to a future time followed by copulation to show execution of the promissory agreement; and (3) in at least one jurisdiction, Scotland, consent follows mere habit and repute of marriage. Bishop on Marriage, Divorce and Separation, Vol. 1, § 341. South Dakota has rejected the two later and more lenient methods of proving consent. By statutory enactment form (1) noted above, requiring consent by words of the present tense, has been adopted. SDC 14.0104. In addition this state has. imposed the requirement of immediate cohabitation following such consent. SDC 14.0101. "Such a marriage must be evidenced by words disclosing a meeting of the minds, uttered in the present tense for the purpose of establishing the relation of husband and wife, and until they have lived together as such, the contract is not complete". Henry v. Taylor, 16 S.D. 424, 433, 93 N.W. 641, 643. See Svendsen v. Svendsen, 37 S.D. 353, 158 N.W. 410. "But certain requisites are necessary to constitute such marriages. There must be an understanding in the present tense that the parties are husband and wife; they must at once, and in good faith, assume the marriage relation with the intent to continue the same during the remainder of their lives". Bracken v. Bracken, 45 S.D. 430, 433, 188 N.W. 46. " ' "It is mutual, present consent, lawfully expressed, which makes the marriage." If they cohabit without such understanding and agreement, they are not husband and wife, however long such relation may continue'." Agnew v. Agnew, 58 S.D. 164, 170, 235 N.W. 644, 646.

■ In all jurisdictions including South Dakota proof of habit and repute, that is of the conduct of the parties toward each other and their reputation as husband and wife in the community, is admissible as evidence of marriage. Where there is direct proof of the parties' intention, as where one party testifies as to what was said, such proof must form the basis of the decision entirely free of any presumption of marriage arising from evidence that the parties acted as if, and gave the public the impression that they were, man and wife. 55 C.J.S., Marriage, § 43, p. 888; Bishop, Marriage, Divorce and Separation, Vol. 1, § 344. " 'If a litigant does not rest a case upon proof of cohabitation and reputation but offers evidence of the marriage contract itself, the result must depend upon the sufficiency of the latter evidence.' " Jordan v. Mohan, 15 N.J.Super. 513, 83 A.2d 614, 616. See Pierce v. Pierce, 355 Pa. 175, 49 A.2d 346, and the cases there cited.

> "In civil cases, reputation and cohabition are admitted as evidence of an actual marriage. * * * When, however, we have the testimony of one of the parties as to the terms of the contract, and that shows that there was no contract by words in praesenti, all other evidence on the subject is of no importance."

In re Tholey's Appeal, 93 Pa. 36, 38. This principle, in a wholly different fact situation, was the basis of the decision of this court in Lunde v. Dwyer, 74 S.D. 559, 56 N.W.2d 772. It also finds support in the principle announced in the case of Miller v. Stevens, 63 S.D. 10, 256 N.W. 152, and the other South Dakota cases of similar import, limiting a litigant's rights to his own testimony, especially where the testimony relates to matters peculiarly within his knowledge. There can be no doubt of the soundness of this well established legal principle as it applies to marriage without ceremony.

From the foregoing authorities it is clear that the real problem in this case is to determine the intention of the parties from the words that passed between them when they began their cohabitation. The law in this jurisdiction requires not only consent but an expression of consent as appears in the cases hereinbefore cited. One authority says "a simple expression of mutual consent" is needed and no more.

Schouler, Marriage, Divorce, Separation, Vol. 2, § 1171. The language used in this case, elicited from one of the parties after exhaustive and intensive examination, and that bears on the parties' real intention, forcefully demonstrates the untrustworthiness of mere cohabitation and reputation as proof of marriage. The cohabitation of the parties in this case, clearly and beyond any question, is no better proof that they were married than it is that they were enacting a deception designed to serve a purpose of enjoying sexual union and all other pleasures of intimate association common to the marriage state but free of its bonds and ultimate responsibilities.

Respondent testified on two separate occasions concerning the conversations had when he began to live with decedent. Such conversations indicate neither understanding of nor reliance on marriage by common law on either his part or decedent's. On the occasion of his first deposition, taken in Minneapolis, he indicated no real understanding of marriage under the common law or that there could be a marriage without ceremony, except on being hard pressed on cross-examination into an admission that he and decedent had never been married, following his own counsel's interjection, "they were married as a matter of fact", respondent said, "Well, common law, as you call it". He then acknowledged that his counsel had given him an explanation concerning common law marriage. His second examination was at the time of the first trial of the issue before a trial judge other than the one presiding at the trial from which this appeal was taken. In it he admitted again that he had discussed marriage under the common law with his counsel. In this second examination he made several references to marriage by common law some of which even then indicated only a vague conception of the subject. He said in the second examination, reluctantly acknowledging he had made a somewhat damaging admission in the first examination, "Perhaps I did; but I considered we was already married as a common law".

There are clear conflicts in the testimony he gave in his first deposition and in his second examination. There are even contradictions within the first examination with one statement intended to support his position that there was a

marriage in fact, conflicting with testimony on the same detail tending to disprove a marriage.

Respondent testified with reference to the marriage "It was by agreement". This constituted a conclusion having no probative force considered in the light of the other testimony. There are several other instances in which respondent drew or attempted to draw similar conclusions. Statements such as these that marriage took place by a particular custom are only expressions of opinion and amount to nothing. Henry v. Taylor, supra.

When respondent was asked by his own counsel to state in his own words "the talk and all the story about your living together" respondent testified he told decedent that if he sent for her they could get married in South Dakota "because my folks belong to the Lutheran church and we can get married in the Lutheran church"; that he wrote her; that she answered she had changed her mind and was not coming; that he didn't hear from her for a year; that she then arrived in the buggy in the manner hereinbefore set out; that he asked her why she hadn't written so he could make arrangements; that she said "We'll tell the people we were married when you was in Chicago"; that he said "Well, if you want it that way * * * You'll have to change your name if that is the case. After this you're Mrs. Erickson", and "I'm going to introduce you to all my friends as my wife, Mrs. Erickson"; that she agreed to this and that that was the whole story.

It is our view that much of the testimony dealing with elements of marriage, such as promise to support or taking another as a spouse, or references such as "After this you're Mrs. Erickson", given by respondent in one instance are negatived by testimony on the same subject in another instance, or are part of the deception rather than evidence of marriage; that certain other testimony constitutes conclusions only as stated; that with these two classes of testimony eliminated the only thing remaining with probative force and that forms any conviction of belief whatever is that testimony disclosing the intention to tell people the parties were married in Chicago and to represent decedent as respondent's wife. At no place in the testimony does re-

spondent's case rise above the level of the testimony summarized above, given in response to his own counsel's suggestion that he tell the whole story in his own words. It is our view that the whole evidence considered together furnishes no substantial proof of consent or intention to marry. Nothing, in the words presumed to have been spoken, indicates a clear intention, as the law requires, or any intention at all, that these people took each other as husband and wife forever, as the law requires, or for any time. Neither is there any such intention shown by acts rather than words, assuming such can be the case. The only acts on which to rely here are acts of cohabitation and representation of marriage. To find consent from mere cohabitation, or habit and repute, with the full facts of the real arrangement disclosed in words from which no marriage agreement is shown, violates the law of evidence in this jurisdiction. It would apply the law of the rare jurisdiction where consent consists of mere habit and repute. It would also violate the substantive law of the state by eliminating the substantive element of consent necessary to marriage and substitute therefor cohabitation, even though illicit because not shown to be pursuant to marital intent.

The "exceptional facts" required by our law to justify a finding of marriage in violation of statutory directives are wholly lacking. Neither exceptional fact nor plausible reason appears why, if the parties intended marriage, they did not follow the conventional pattern. Prior to decedent's change of heart in Chicago, a church marriage had been planned. No religious differences stood in their way, no scruples against ceremony constituted a bar. There was a church in their immediate vicinity and they took part in its actvities the day after decedent arrived. Circumstances of religious difference and other difficulties tending to prevent ceremonial marriage often appear in the cases as justification for marriage by private agreement. Such are wholly lacking here.

The whole evidence contrary to proving marriage between the parties tends to show an impulsive venture into, or a continuation of, an illicit relationship of the kind least offensive to society because the parties covered it with the

cloak of marriage. The ultimate result and involvements were scarcely in the contemplation of the parties because of the consuming anticipation of immediate pleasure. With a little change in fortune and attitude of mind it might have ripened into marriage; but it in fact did not; and the most apparent reason for this failure is the fact that the relationship was conceived in deception.

■ Inasmuch as it is our opinion that there is no substantial evidence of marriage the trial court was in error in entering findings and conclusions that the parties were married. In view of our determination that there was no marriage respondent under the law is not the surviving husband and is not entitled to inherit the estate. It should pass by succession to decedent's next of kin.

Because the trial judge reached a different conclusion he did not consider the question raised below as to the propriety of the allowances made in the county court to the administrator's attorneys for their fees and expenses. In view of our holding on the marriage this question now becomes material in the circuit court. It appears that not all of the claimed compensation is related to preservation of the assets of the estate but rather that some of the services involved were rendered to respondent in his effort to establish himself as the sole heir. This circumstance, together with all other lawful considerations, should be factors in arriving at a fair and reasonable allowance commensurate with the services actually rendered in behalf of the administrator for the benefit of decedent's estate.

The judgment from which the appeal is taken is reversed and the case is remanded to the circuit court with directions to enter a judgment instructing distribution of the estate and an allowance of fees and expenses in a manner not inconsistent wth this opinion.

All the Judges concur.